COMMONWEALTH *vs.* CHARLES W. DOUCETTE, JR.

Essex. May 9, 1990. - September 25, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Appeal by Commonwealth, Required find-
ing. *Rules of Criminal Procedure.*

On an appeal by the Commonwealth from a judge's order allowing a mo-
tion under Mass. R. Crim. P. 25 (b) (2) for a required finding of not
guilty following a jury verdict of guilty of murder in the first degree,
this court, applying the standard set out in *Commonwealth* v. *Latimore*,
378 Mass. 671, 677 (1979), concluded that the evidence, although not
overwhelming, was sufficient to warrant a rational trier of fact to find
beyond a reasonable doubt that the defendant had murdered the victim.
[456-462]

INDICTMENTS found and returned in the Superior Court
Department on April 8, 1987.

The case was tried before *John T. Ronan*, J., and a post-
conviction motion was heard by him.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Elin H. Graydon*, Assistant District Attorney, for the
Commonwealth.

*Robert A. George* for the defendant.

O'CONNOR, J. This is the Commonwealth's appeal from a
judge's order allowing the defendant's motion for required
findings of not guilty after a jury had found the defendant
guilty of murder in the first degree and unlawfully carrying a
firearm in a motor vehicle. We transferred the case from the
Appeals Court to this court on our own initiative. The Com-
monwealth has failed to present an argument within the
meaning of Mass. R. A. P. 16 (a) (4), as amended, 367
Mass. 921 (1975), with respect to the indictment for unlaw-

fully carrying a firearm in a motor vehicle. Therefore, as to that charge, we affirm the order below. However, we vacate the order allowing the defendant's motion for a required finding of not guilty of murder, with the result that the jury's verdict of guilty of murder in the first degree is reinstated.

The defendant moved for the entry of a required finding of not guilty on the two indictments at the close of the Commonwealth's case. The judge denied that motion. The defendant presented a similar motion at the close of all the evidence, and that motion, too, was denied. The jury then found the defendant guilty of murder in the first degree and guilty on the carrying charge, and the judge discharged the jury. On the following day, the defendant filed the following motion in reference to both indictments: "The defendant moves that the Court enter a required finding of not guilty on the ground that the evidence is insufficient as a matter of law to sustain a conviction of the defendant." The trial judge subsequently endorsed the motion in this way: "After hearing, Allowed. [S]ee *Jackson* v. *Virginia*, 443 U.S. 307[;] *Commonwealth* v. *Latimore*, 378 Mass. 671 and Mass. R. of Crim. Procedure R 25."

Rule 25 of Mass. R. Crim. P. provides in relevant part as follows: "(a) Entry by Court. The judge on motion of a defendant or on his own motion shall enter a finding of not guilty of the offense charged in an indictment . . . after the evidence on either side is closed if the evidence is insufficient as a matter of law to sustain a conviction on the charge . . . . (b) Jury Trials. . . . (2) Motion after Discharge of Jury. If the motion is denied and the case is submitted to the jury, the motion may be renewed within five days after the jury is discharged and may include in the alternative a motion for a new trial. If a verdict of guilty is returned, the judge may on motion set aside the verdict and order a new trial, or order the entry of a finding of not guilty, or order the entry of a finding of guilty of any offense included in the offense charged in the indictment or complaint."

Pursuant to rule 25 (b) (2), a trial judge has discretion to award a new trial on the ground that the verdict, although

supported by legally sufficient evidence, was against the weight of the evidence, *Commonwealth* v. *Preston*, 393 Mass. 318, 324 (1984), or because its integrity was suspect. *Commonwealth* v. *Cornish*, 28 Mass. App. Ct. 173, 177-178 (1989). Rule 25 (b) (2) also empowers a judge to reduce the jury's verdict to guilty of a lesser included offense when, in the judge's discretion, including his or her view of the credibility of the witnesses and the weight of the evidence, the lesser verdict is required in the interests of justice. *Commonwealth* v. *Keough*, 385 Mass. 314, 318-321 (1982). *Commonwealth* v. *Gaulden*, 383 Mass. 543, 555 (1981). A judge's exercise of discretionary power is subject to review only for possible abuse. *Id.* at 557. In deciding a rule 25 (b) (2) motion for a required finding of not guilty following a guilty verdict, however, the judge does not properly exercise discretion concerning the weight or integrity of the evidence, but instead must assess the legal sufficiency of the evidence by the standard set out in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). *Commonwealth* v. *Marsh*, 26 Mass. App. Ct. 933, 935 (1988). *Commonwealth* v. *Torres*, 24 Mass. App. Ct. 317, 323-325 (1987). The question is one of law.

The defendant's postconviction motion was limited to a request for the entry of a required finding of not guilty on the ground that the evidence as to both indictments was legally insufficient to sustain a conviction. It is clear from the judge's endorsement on the motion that the judge's action was based on his determination that the evidence was insufficient to prove guilt as a matter of law. Thus, the question for this court on appeal is, as it was for the judge, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore, supra* at 677, quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Although the record makes abundantly clear that the trial judge was extremely dissatisfied with the credibility of the Commonwealth's witnesses, the weight of the Common-

wealth's evidence, the competence and integrity of its investigation, and with the conduct of the prosecution generally, he neither engaged in an exercise of discretion nor did he purport to acquit the defendant as a sanction for perceived misconduct on the part of the Commonwealth. The defendant's motion did not seek such remedies. Therefore, our inquiry is limited to the correctness of the judge's ruling that, measured by the *Latimore* standard, and without reference to the credibility of the witnesses or weight of the evidence, see *Commonwealth v. Cinelli*, 389 Mass. 197, 204 (1983); *Commonwealth v. Fitzgerald*, 376 Mass. 402, 410-411 (1978) and cases cited; *Commonwealth v. Torres*, *supra* at 322-324, the evidence was insufficient to support the verdict of guilty of murder. In this connection, we note that the defendant does not argue that, even if the evidence was sufficient to support a verdict of guilty of murder, it did not warrant a verdict of murder in the first degree. The defendant's contention is that the evidence was insufficient as a matter of law to warrant a finding of murder.

We recite the facts that the jury, viewing the evidence in the light most favorable to the Commonwealth, reasonably could have found at the close of the Commonwealth's case. From June until August, 1986, the victim, Raymond Bufalino (Bufalino), worked at Charlie's Texaco gasoline station in Salem. The defendant's father (Doucette, Sr.) owned and operated the station. The defendant also worked there. While working at the station, Bufalino was injured. There was no workers' compensation insurance. Beginning in 1986, Doucette, Sr., tried several times to persuade Bufalino to sign a release relieving Doucette, Sr., of liability. Bufalino refused to do so.

The evidence indicated that, during the summer or fall, 1986, Bufalino and his wife, Shauna, borrowed $1,000 from Doucette, Sr., which they repaid in October, 1986. Bufalino also borrowed $1,000 from the defendant, which the defendant asked Bufalino to repay in 1986. Shauna Bufalino obtained a loan from a credit union and repaid $500 on Christmas Eve, 1986. In January and February, 1987, Shauna

Bufalino received twenty to twenty-five telephone calls from the defendant asking when she would repay the balance of the loan.

On Saturday, February 21, 1987, Bufalino left his home in Salem at approximately 6 A.M. and visited his parents in Lynn. He ate a breakfast consisting of ham, eggs, juice, and coffee at approximately 7 A.M. and returned to his home at approximately 9 A.M. The defendant was with him then. The defendant was wearing navy blue pants and a blue and red ski parka, and had a black beard and mustache. Bufalino and his wife discussed with the defendant a letter that the defendant had given to Bufalino concerning the release of workers' compensation claims. The defendant said that his father did not "want anybody to be hurt in reference to the letter." Bufalino asked the defendant why the defendant's father had sent the defendant to pressure Bufalino into signing a release. The defendant responded that he did not know, and he suggested that Bufalino ask Doucette, Sr., himself. The defendant and Bufalino spoke quietly for approximately ten minutes, and then the two left Bufalino's home in separate automobiles at approximately 9:15 A.M. The defendant drove off in a red automobile and Bufalino left in a beige Chevrolet Citation automobile.

At approximately 10:15 A.M., the defendant called Shauna Bufalino and asked her if her husband had returned home. He told her that her husband had been expected to go to Charlie's Texaco station to discuss with Doucette, Sr., the prospect of working there again, but he had not shown up. Shauna Bufalino telephoned several people to ask if they had seen her husband that morning. No one had seen him. She then borrowed a friend's automobile and went searching for her husband. Eventually, at about 3 P.M., she saw the beige Chevrolet Citation parked on the side of Harmony Grove Road near the Salem-Peabody town line. When she opened the driver's side door, she found her husband sitting slumped over the driver's seat. There was blood on the steering wheel and on the seat next to him. Fragments of two bullets were later found in Bufalino's head. The doctor who performed

the autopsy determined from an examination of the contents of the victim's stomach that the victim had eaten ham two to six hours before his death. Thus, although there was a considerable amount of conflicting evidence concerning the time of Bufalino's death, the jury reasonably could have inferred from the fact that Bufalino had eaten ham around 7 A.M., that he had died between 9 A.M. and 1 P.M.

The evidence would have warranted the jury in finding the following facts with respect to the defendant's activities. The defendant arose at about 8 A.M. on February 21 and dressed as if he were going to work. When he left his apartment, the defendant told his former girlfriend, Wendy Frederickson, who had spent the night with him, that he was going to work. Frederickson remained in bed and next saw the defendant naked and with wet hair sometime between 10 A.M. and 10:30 A.M. that morning after the defendant had returned to his apartment. The jury could have found that at 9:45 A.M. or 10:30 A.M. the defendant telephoned his father and told him that he would not be in to work that morning and that Bufalino would be in to discuss the possibility of working at the gasoline station again.

There also was evidence that the defendant spent most of Saturday afternoon and evening at his apartment with Frederickson. On the following Sunday morning, after Doucette, Sr., informed the defendant that the police were looking for him, the defendant went to the police station, arriving there at about 10:30 A.M. A police officer testified that the defendant stated that he was six feet, three inches tall and weighed 220 pounds. Although there was conflicting evidence, the jury could have found that the defendant still had a beard and mustache on Sunday morning. The police asked the defendant about his whereabouts on the previous day. He told them that his roommate, David Marshall, had driven him in Marshall's green Chevrolet Malibu automobile to the Bufalino residence at 8 A.M. or 8:30 A.M. so that he could collect $100 as part payment of Bufalino's $1,000 indebtedness to him, that he spoke to Bufalino on the porch so that Bufalino's wife would not hear the conversation, that he collected

the $100, that the victim agreed to sign a workers' compensation release, and that then Marshall and the defendant returned to their apartment where the defendant went back to bed. On the basis of other evidence, the jury would have been warranted in finding that many of these statements were untrue. The defendant denied that he had been near Harmony Grove Road on Saturday.

There was testimony that the defendant went to the apartment of his girlfriend, Ann Grove, on Sunday evening at about 5 P.M. Shortly after he arrived, the defendant shaved his face and soaked his hands in bleach for about ten minutes. When he left Grove's apartment about an hour and a half later, his hands, which were normally quite hairy, had no hair on them and also had several small nicks and cuts. The defendant was arrested at approximately 8:15 that night.

The jury heard evidence from which they could infer that in November, 1986, the defendant was given a gun capable of firing the kind of bullets that were found in Bufalino's head, that the defendant still possessed this gun in mid- or late January, 1987, and that in May, 1987, the defendant threatened two witnesses that he would harm them if one of them, who had told the police about the defendant's possession of the gun, did not "smarten up."

Finally, we recite some of the evidence given by witnesses who were on or near Harmony Grove Road on the morning of February 21, 1987. One witness who lived on a street near Harmony Grove Road thought he heard a gunshot sometime between 9:30 and 10:30 A.M., and then looked out his window and saw a man taller than five feet ten inches and wearing dark pants and a blue denim coat running on Harmony Grove Road. He also saw a tan or cream colored car parked on Harmony Grove Road. Two other persons driving along Harmony Grove Road that morning saw a big man — one person said that the man was five feet nine inches or five feet eleven inches, the other said over six feet tall with a heavy build — walking along Harmony Grove Road at about 9:25 A.M. The man had a beard and mustache and was wearing a

blue parka and blue pants. After they passed this man, the two witnesses saw a small beige car parked on the side of Harmony Grove Road.

We conclude that, although the evidence was far from overwhelming, it was sufficient to warrant a rational trier of fact to find beyond a reasonable doubt that the defendant murdered Bufalino. First, the defendant could have been found to have had ample opportunity to commit the crime. Several witnesses testified that the defendant was the last person they saw with Bufalino on the morning when the jury could have found Bufalino was killed. The witnesses testified that a man fitting the defendant's general description and wearing the same color pants that the defendant was wearing that day was near the place where Bufalino was killed around the time they could find he was killed. Also, the defendant could have been found to have been motivated to kill Bufalino because of Bufalino's failure to give the release for his injuries at Doucette, Sr.'s, gasoline station, and Bufalino's failure to pay his debt to the defendant in full. The evidence also warranted a finding that the defendant possessed the murder weapon a month or so before the murder. Although, as the defendant correctly points out, the ballistic evidence was far less than conclusive, and in fact was sometimes inconsistent, it was nevertheless legally sufficient to permit the jury to infer that the defendant had in his possession the murder weapon in mid-January, 1987. See *Commonwealth* v. *Fitzgerald, supra* at 410-411 (inconsistent evidence is not insufficient evidence).

Finally, there was extensive evidence of the defendant's consciousness of guilt, including lying to the police, bleaching his hands and shaving his beard and mustache, returning to his apartment and showering on Saturday morning, and intimidating likely Commonwealth witnesses. Actions and statements that indicate a defendant's consciousness of guilt, together with other evidence, are sufficient to prove his guilt. *Commonwealth* v. *Cordle*, 404 Mass. 733, 741 (1989). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 55 (1975).

Although it is true that the case against the defendant rested on circumstantial evidence, "[i]t is well settled that a case may be submitted to the jury on the issue of a defendant's guilt on circumstantial evidence." *Commonwealth* v. *Healy*, 393 Mass. 367, 383 (1984). Of course, it is possible that someone else may have killed Bufalino, but, at the close of the Commonwealth's case, the evidence was enough so that the jury were not left to speculate as to the defendant's guilt. Furthermore, the Commonwealth's "position as to proof [did not] deteriorate between the time the Commonwealth rested and the close of all the evidence." See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 & n.1 (1976). We are satisfied that the case is fairly distinguishable from *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987), and *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), cases on which the defendant relies and in which we held that the evidence was insufficient to sustain convictions.

The order requiring the entry of a finding of not guilty on the murder indictment is vacated, and the jury verdict of murder in the first degree is reinstated. Sentence is to be imposed in the Superior Court. There having been no argument with respect to the indictment for unlawfully carrying a firearm in a vehicle, the judgment of acquittal as to that indictment is affirmed.

*So ordered.*