## COMMONWEALTH *vs.* KEVIN BUSH.

Plymouth. February 3, 1998. - March 4, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Homicide. Practice, Criminal,* Required finding, Instructions to jury, Volun-
tariness of statement, Capital case. *Evidence,* State of mind, Inference,
Relevancy and materiality.

At the trial of indictments for murder in the first degree, the evidence as a
whole was sufficient to warrant a rational trier of fact to find beyond a
reasonable doubt that the defendant had committed the murder and had
acted with deliberate premeditation. [30-31]
At a murder trial, conversations between the defendant and his girl friend,
which furnished a reason for the defendant to harbor anger, anticipate a
confrontation, and arm himself with two handguns, were properly admitted
to show their impact on the defendant's state of mind. [31]
At a murder trial, two handguns were properly admitted in evidence where
there was a sufficient evidentiary basis to permit an inference that they
were the same handguns used by the defendant to commit the murders.
[31-32]
At a murder trial, the judge properly instructed the jury concerning the role of
circumstantial evidence, their consideration of all the evidence, and the
voluntariness of the defendant's statements. [32-33]

INDICTMENTS found and returned in the Superior Court Depart-
ment on January 24, 1992.

The cases were tried before *Robert L. Steadman,* J.

*Willie J. Davis* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Com-
monwealth.

GREANEY, J. A jury convicted the defendant on two indict-
ments charging murder in the first degree on the theory of
deliberate premeditation. He is represented by his trial counsel
on appeal, and he raises issues as to the sufficiency of the Com-
monwealth's evidence, evidentiary rulings, and the jury instruc-
tions. We affirm the convictions. We also conclude that there is
no basis to exercise our authority under G. L. c. 278, § 33E,
either to order a new trial or to reduce the verdicts.

We summarize the evidence in the light most favorable to the Commonwealth. The victims, Melvin Bonnett and Christopher Green, were shot and killed in the hallway of an apartment building in Brockton on December 13, 1991. The defendant lived in the building with his girl friend, India Noiles, and her two daughters. Bonnett also lived in the building.

Approximately three weeks before the murders, Noiles "beeped" the defendant on his pager and told him that she was afraid because a friend had said that Bonnett had been pointing at the door to her apartment. The defendant came home and searched the hallways of the apartment building. Finding no one, he assured Noiles, "Don't worry, nobody's going to hurt you." When asked by defense counsel why she had been afraid of Bonnett, Noiles replied that, although she had never had any contact with Bonnett, she knew that Bonnett and the defendant were on opposite sides of a gang.

On the day before the murders, the defendant asked Noiles about a gold chain that he had previously given to her. Noiles had sold the chain, but told the defendant that she had given it to Michael Johnson, her former boy friend and father of her two children. Referring to Johnson, the defendant said to Noiles, "Dog better give me back my chain. I want my chain." Later that night, after Noiles had returned from seeing Johnson, she heard the defendant saying, "Dog better give me my chain. I want my chain. You better get that chain. You better get that chain. I ain't playing."

On the day of the shootings, the defendant returned from Worcester and said to Noiles, "I'm not worried now. I ain't got no problem with Dog now. I'm all right." A short time later, Noiles saw a bullet on the nightstand and asked the defendant about it. He replied, "I only have five of [them]. Give me that."[1]

Later that evening, the defendant, Noiles, and Noiles's daughters visited Noiles's father in the Dorchester section of Boston. Upon their arrival, the defendant refused to get out of the car, saying, "Look at all these detectives and these police around here. It's all right, [because] I'm strapped anyway." When Noiles asked what he meant, the defendant lifted his shirt, and Noiles saw two handguns tucked in the waistband of his pants, one small and dark in color, the other silver.

[1]Noiles's daughter, Tamika, also testified that she had seen two bullets of different sizes in the defendant's drawer of the bedroom dresser.

During the drive back to Brockton, the defendant and Noiles argued about her plans to go out with her girl friends that night. The defendant stopped the car and got out, saying he would walk home. As Noiles began to drive away, she looked back and saw the defendant waving his arms in the air, holding a gun in each hand. She backed the car up and told him to get in. They continued to argue during the rest of the drive.

When they reached their apartment building, Noiles dropped off her two daughters and the defendant, and then continued on to her friend's house. Bonnett was on the steps leading to the lower level, and he exchanged greetings with Noiles's daughter, Tamika. Tamika testified that after they entered the apartment, the defendant went into her mother's bedroom, then got something to drink, and began looking for his coat. He seemed "[a] little bit" upset, and began taking all of the coats out of the closet and putting them on the floor. After he found his coat on the couch, he left the apartment. Tamika testified that the coat was dark and came a little below the waist, and that the defendant was also wearing dark jeans and a dark hooded sweatshirt.

After Tamika closed the door behind the defendant, she heard the defendant say, "No one's getting my woman, you punk mother f'ers." As Tamika was walking away from the door, she heard a sound, "[l]ike firecrackers."[2] A few minutes later, Tamika went out into the hallway and saw both victims lying on the stairs. She went back to her apartment and called her mother, who came home and took both daughters to a friend's house.

The Brockton fire department and ambulances responded to a call concerning the murders shortly after 11 P.M. on December 13, 1991. A security guard at the DeSantis Chevrolet automobile dealership, located near Noiles's apartment, testified that he saw a man running through the dealership's lot at approximately 11 P.M. on that same date. He described the man as black, stocky, weighing about 200 pounds, and wearing a black, three-quarter length jacket over a dark hooded sweatshirt. Three to five minutes later, the guard testified that he heard sirens as the ambulance and police cruisers arrived at the apartment building.

[2]Another witness, Angela Sposini, testified that she had been sitting down the hallway from where the victims were located at the time of the murders, and heard someone say, "Here comes that fat dude," followed by four gunshots. She did not see anyone else in the hallway.

When India Noiles and her daughters arrived at her friend's house, the defendant was on the telephone looking for her. He said to Noiles, "You see all those police and fire trucks down there? I did that." After Noiles said, "Stop playing with me. Don't lie," the defendant replied that he was "just kidding." He asked her to pick him up at a nearby Dunkin Donuts shop, telling her, "Take the back roads. Creep. Just come slow. You know, like sneak."[3] Noiles did not go to pick him up.

Noiles had no further contact with the defendant until she spoke to him by telephone two days later. When she asked the defendant why he had not come home, he said that things would be okay in a couple of days and to let it "die down." The defendant had not come home by the following weekend, when Noiles arranged a three-way telephone conversation between herself, the defendant, and a State trooper, David DeBuccia. The defendant told DeBuccia that he was not involved in the shootings, and agreed to meet DeBuccia at the Brockton police department the next day. The defendant called Noiles back later that day and asked her what she told the police. When Noiles said that she told them about everything, including the guns, the defendant said, "Oh shit, I'm out of here," and hung up. The defendant did not show up the next day for the scheduled meeting with DeBuccia and did not make any further contact with Noiles. He was located in New York City twenty-one months later, and was placed under arrest for the murders of Bonnett and Green.

A witness testified that six months after the murders, while clearing brush outside of an office building next to the DeSantis Chevrolet auto dealership, he found two handguns under some bushes and turned them over to the police. One was a .32 caliber revolver, and the other was a .22 caliber revolver. They were both dirty and rusted. One bullet had been discharged from the .32 caliber revolver, and three bullets had been discharged from the .22 caliber revolver. A total of four bullets previously had been recovered related to the shootings: a .32 caliber from Bonnett, two .22 calibers from Green, and a .22 caliber from the

---

[3] An employee of the Dunkin Donuts, who was working on the night of the murders, stated that a black male, wearing a dark sweatshirt and dark pants, was in the restaurant at approximately 11:20 P.M. The male seemed nervous, said he was waiting for a ride, and left a short time later. Telephone company records showed that three calls were made from the pay telephone outside the Dunkin Donuts between 11:27 P.M. and 11:54 P.M., all to the home of Noiles's friend and all charged to Noiles's "calling card."

stairway wall of the apartment building where the victims were shot. Due to the "poor markings of the evidence," the police ballistician could not positively identify that the bullets recovered from the victims had been fired from these guns. However, both the bullet configurations and the "rifling" patterns were similar for the bullets recovered from the guns and those recovered from the victims. When shown the guns during her testimony, India Noiles stated that they looked exactly like the ones she saw in the possession of the defendant.

1. The defendant argues that this evidence was insufficient to warrant jury verdicts of guilt beyond a reasonable doubt because the Commonwealth's proof failed to identify him as the murderer and to establish the requisite deliberate premeditation. We do not agree.

"[The] question [in consideration of a motion for directed verdict of not guilty] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). "The question of guilt must not be left to conjecture or surmise." *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985). However, circumstantial evidence is competent to establish guilt beyond a reasonable doubt. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986), and cases cited. An inference drawn from circumstantial evidence "need only be reasonable and possible; it need not be necessary or inescapable." *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977).

The jury reasonably could have concluded, from the evidence as a whole, that the defendant was the murderer even though no witness actually saw him fire the shots that killed the two victims. The defendant's voice was heard from the area of the murders just before the shots were fired, and no one else was seen there. See *Commonwealth* v. *Doucette*, 408 Mass. 454, 461 (1990) (defendant was last one seen with victim and man fitting the defendant's description was seen near where killing took place). The defendant possessed two handguns that were consistent with the two murder weapons. "Although, as the defendant correctly points out, the ballistic evidence was far less than conclusive . . . . it was nevertheless legally sufficient to

permit the jury to infer that the defendant had in his possession the murder weapon[s].'' *Id.* These facts, combined with the defendant's admission, the strong evidence of consciousness of guilt, and the evidence of motive, were adequate to allow the jury to find, beyond a reasonable doubt, that the defendant was the murderer. The permissible inference that could be drawn by the jury, that the defendant went to the scene armed with two handguns and thereafter fired four shots killing the two victims, was sufficient to allow the jury to find deliberate premeditation beyond a reasonable doubt. See *Commonwealth* v. *Williams,* 422 Mass. 111, 122-123 (1996) (deliberate premeditation can be inferred, where evidence permits, from the use of a deadly weapon). The Commonwealth's case was not one, as the defendant suggests, where the jury's verdicts rested on improper speculation.

2. We next take up issues pertaining to evidentiary rulings.

(a) There was no error in the admission in evidence of the conversations between India Noiles and the defendant pertaining to Noiles's telling the defendant, on one occasion, about her reaction to the victim Melvin Bonnett pointing at her door and, on another occasion, about giving the gold chain she had received from the defendant to her former boy friend. The conversations were not admitted to prove the truth of the matters mentioned therein, but to show their impact on the defendant's state of mind. See *Commonwealth* v. *Fiore,* 364 Mass. 819, 824 (1974). The evidence furnished a reason for the defendant to harbor anger, to anticipate a confrontation, and eventually to arm himself with two handguns. The evidence was properly admitted.

(b) There was a sufficient evidentiary basis to permit an inference by the jury that the two handguns admitted in evidence were the same handguns used by the defendant to commit the murders. The two handguns were of the same caliber as the handguns used to kill the victims. The four bullets recovered from the victims, and at the scene, were consistent with four bullets that could have been fired from the handguns. There was testimony that the rifling systems of the two handguns were similar to the handguns used in the murders. A man fitting the defendant's description was seen running through the area where the handguns were eventually found. Noiles, during her testimony, gave a positive identification of the handguns as the ones possessed by the defendant. The admission in evidence of

the recovered handguns was not, as the defendant suggests, so lacking in foundation, reliability, or relevance, that exclusion was mandated. The defendant's contentions about the handguns did not affect the admissibility of the evidence, but rather went to its weight. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 230 (1992); *Commonwealth* v. *Andrews*, 403 Mass. 441, 462-463 (1988); P.J. Liacos, Massachusetts Evidence § 11.3, at 657-658 (6th ed. 1994).

3. Nothing in the defendant's arguments concerning the jury instructions furnishes a basis to order a new trial.

(a) The judge gave to the jury a detailed instruction on the role of circumstantial evidence, the standards to be applied in drawing inferences, and the fact that, in a case based on circumstantial proof, the defendant could be found guilty "only if [the] circumstances are conclusive enough to leave you with a moral certainty [of his guilt]."[4] The judge committed no error in declining to give the defendant's requested instruction that the jury should use "[g]reat care and caution . . . in drawing inferences from proved facts." We are satisfied that fairly read, the instructions about the role of circumstantial evidence were adequately balanced with instructions about the Commonwealth's burden of proof.

(b) The judge was not required to give the defendant's requested instruction that the jury could "not find guilt based solely upon the [defendant's purported] admission." See generally *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957). The jury were made well aware, by the judge's instructions

---

[4]The judge went on to say at this point in the jury instructions that "moral certainty" meant "a clear and satisfied belief that the defendant is guilty and that there is no reasonable explanation of the facts as proven." No objection was made to this statement. The defendant now argues that the instruction lessened the Commonwealth's burden of proof by equating reasonable doubt with "a clear and satisfied belief." In addition, the defendant argues that the statement "there is no reasonable explanation of the facts as proven" was in error and created a substantial likelihood of a miscarriage of justice.

These arguments lack merit. A full explanation of reasonable doubt had been furnished to the jury in accordance with *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). In addition, the judge obviously misspoke in the last instruction, neglecting to add the word "other" between the words "no" and "reasonable." The jury likely perceived the omission when, in the very next sentence, the judge corrected any possible misconception by telling the jury, "The evidence must not only be consistent with the defendant's guilt, it must be inconsistent with his innocence." There could be no harm caused by these instructions.

considered as a whole, that the determination of guilt in this case had to rest on a consideration of all pieces of the evidence, as they intertwined and supported each other, and that one piece of evidence alone could not necessarily justify finding the defendant guilty.

(c) The judge gave the jury the humane practice instruction during the course of the trial. At that point, the judge told the jury that they must determine whether any statements made by the defendant were done so voluntarily, knowingly, and intelligently, after consideration of "the totality of all the evidence in this case, all the surrounding circumstances in this case, the characteristics of the conversation, the details, the type of interrogation or questions that were put." The judge later instructed the jury in the charge that, with respect to the defendant's admission, "You may not consider any such statement in your deliberations unless, from all the evidence in the case, the Commonwealth has proven beyond a reasonable doubt that the defendant made the alleged statements . . . and that the statements that he made were voluntarily and freely and rationally given." The judge was not required to elaborate on this requirement any further in the manner now suggested by the defendant (who made no request for an instruction at trial) to list factors that have relevance to determining voluntariness. See *Commonwealth* v. *Kosilek*, 423 Mass. 449, 456-457 (1996).

4. A review of the entire record under G. L. c. 278, § 33E, shows no basis for relief.

*Judgments affirmed.*