## COMMONWEALTH vs. LEON STEWART.

Barnstable. September 7, 2007. - November 7, 2007.

Present: MARSHALL, C.J., GREANEY, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Criminal,* Severance, Trial of defendants together, Fair trial, Required finding, Confrontation of witnesses, Argument by prosecutor, Voir dire, Assistance of counsel, Capital case. *Due Process of Law,* Fair trial. *Homicide. Malice. Evidence,* Hearsay, Admissions and confessions, Relevancy and materiality, Cross-examination, Prior misconduct, State of mind. *Jury and Jurors. Constitutional Law,* Assistance of counsel.

A criminal defendant failed to demonstrate that any prejudice arising from his joint trial with a codefendant was so compelling that it prevented the defendant from obtaining a fair trial, where, even assuming that the defenses were inconsistent or mutually exclusive, the jury were warranted in finding the defendant guilty on the basis of eyewitness testimony and other evidence. [30-32]

At a murder trial at which the case was submitted to the jury on theories of both principal and joint venture culpability, the evidence at the close of the Commonwealth's case supported the defendant's conviction of murder in the first degree as a principal on the theory of deliberate premeditation. [32-33]

At a murder trial, error in the admission in evidence of an out-of-court statement made to a joint venturer did not constitute prejudicial error, in light of substantial other evidence that the defendant had shot the victim. [33-35]

At a criminal trial, the admission in evidence of certain irrelevant testimony did not create a substantial likelihood of a miscarriage of justice, where the testimony was a minor point on a collateral issue. [35]

A criminal defendant failed to demonstrate that he was denied the right to meaningful cross-examination of a Commonwealth witness, where, in view of the fact that the witness admitted on cross-examination that her testimony lacked credibility, the defendant accomplished all that possibly could be gained through cross-examination. [35-36]

At a murder trial, the absence of a limiting instruction regarding certain prior bad act evidence demonstrating the defendant's hostile state of mind and possible motive did not create a substantial likelihood of a miscarriage of justice, where there was other strong evidence on the issue [36-37]; further, the prejudicial effect of the evidence did not outweigh its probative value [37].

The judge at a criminal trial erred in ruling that certain testimony was admissible as the witness's opinion about the defendant's hostile state of mind [37]; however, where the evidence was cumulative on the topic, which had been well established by the testimony of other witnesses, its improper

admission did not create a substantial likelihood of a miscarriage of justice [37-38].

At closing argument at a criminal trial, a statement by the prosecutor merely indicating that he had studied the record to present his closing argument did not constitute improper vouching for the credibility of the witnesses. [38-39]

At a criminal trial at which the defendant requested that the judge conduct an individual voir dire of the jurors to determine if anyone had seen the defendant in the lockup, the judge did not err in asking the jury collectively if anyone had seen anything while coming into or leaving court that would have affected their impartiality, and where there was no response, the judge was required to proceed no further [39].

A criminal defendant failed to demonstrate that his trial counsel was ineffective by failing to move to sever the defendant's trial from that of another, by being unprepared for trial, by failing to subpoena certain records to impeach a witness's credibility, by failing to file motions in limine or jury instruction requests concerning prior bad act testimony or hearsay, or by failing to present an organized and coherent defense. [39-41]

INDICTMENT found and returned in the Superior Court Department on October 4, 2000.

The case was tried before *Richard F. Connon*, J., and a motion for a new trial, filed on December 5, 2002, was heard by him.

*Alan Jay Black* for the defendant.

*J. Thomas Kirkman*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation.[1,2] The defendant appeals from his conviction and from the denial of his motion for a new trial.[3] He raises the following arguments on appeal: (1) the judge erred in denying his motion for severance; (2) there was insufficient evidence to support his conviction on individual liability for murder in the first degree; (3) the judge erred in admitting certain statements made to the codefendant; (4) there was misconduct in the direct examination of a Commonwealth witness; (5) the defendant was denied the

---

[1] The theory of extreme atrocity or cruelty was presented to the jury as well, but the jury did not convict on this theory.

[2] The defendant was also convicted of unlawful possession of a firearm. This charge was placed on file and is not before us. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 577 n.1 (2003), citing *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

[3] The motion for a new trial was denied after an evidentiary hearing.

right to meaningful cross-examination of a Commonwealth witness; (6) the judge erred in admitting evidence of prior bad acts of the defendant; (7) the prosecutor improperly vouched for the credibility of witnesses in his closing argument; (8) the judge erred by not inquiring of the jurors when he was informed that the door to the lockup was opened in the presence of jurors; and (9) the defendant's trial counsel was ineffective. Finally, the defendant requests that, if the judgment is not reversed, we exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. We affirm the convictions and the order denying the motion for a new trial, and we decline to exercise our power under G. L. c. 278, § 33E.

*Facts.* We summarize facts the jury could have found, and leave recitation of most details for discussion in conjunction with the issues raised. In the early morning of August 19, 2000, the victim, Jennifer Perkins, was shot and killed while sitting in her Jeep vehicle outside the home of her friend, Deanna Bergstrom, in the Seacoast Shores section of East Falmouth. Her boy friend and the intended target was Tony Vaughan. Vaughan was targeted because a year earlier, James Juertas, a good friend of the defendant and the codefendant, one Milteer Hendricks, had had a disagreement with Vaughan and had been shot. Juertas survived.

The night before the shooting the defendant was riding in a car driven by a friend, Julia Leighton-Mendes. Hendricks and his girl friend, Katie Robillard, were also in the car. The defendant directed Leighton-Mendes to Pembroke Road, where Vaughan was known to frequent a house. Leighton-Mendes knew that the defendant had "caused his own problems" with Vaughan. Robillard believed that they were going to Pembroke Road to find Vaughan and that the defendant did not like him. The defendant also directed Leighton-Mendes to drive down Harvard Drive, another street in the same area. As they drove by Bergstrom's home on Harvard Drive, the defendant removed a nine millimeter gun from his sweatshirt pocket and put it on his lap. At some point he loaded the gun. The defendant and Hendricks both looked at Bergstrom's house as they passed it. Robillard testified that the defendant said, "[W]ait until the time I see Tony. [W]atch."

The following night (the night of the shooting), Crystal Costa, the mother of the defendant's child, and her friend Kiely Coffey went to Hendricks's house and found the defendant, but not Hendricks, there. The defendant suggested they drive to Falmouth to get some "weed." Coffey heard the defendant say on the telephone that he could not "party with the toast. I'm about to go get that." Coffey interpreted the word "toast" to mean a gun and told the defendant she would not go to Falmouth to get a gun, but he explained that he was referring to a necklace. Later that night Coffey drove her car with Costa, the defendant, and Hendricks as passengers. One of the men told Coffey to drive to Seacoast Shores. Hendricks put on a glove. Coffey felt a gun on her hip as she turned into Seacoast Shores and told the defendant to get it away from her. He asked her if she knew "what this is? Keep talking." Hendricks directed Coffey on a circuitous route to Bergstrom's home. Coffey pulled in front of the house, but was directed by one of the men to continue driving. She parked on the other side of the street, three houses away.

The two men left the car, went toward Bergstrom's house and returned after twenty minutes. When a car passed, one of the men said, "That's them," and the two men left the car again. After that, Coffey heard five or six shots. Costa saw both men shooting. They were standing in front of a street light. The two men ran back and jumped in the car. Coffey testified that the defendant said, "I think I got that nigger's girl. She's three months pregnant." Costa said that both men stated, "We got that nigger, TV" [which she took to mean Tony Vaughan]. Both men said, "go, go, go."

After the shooting, one of the men directed Coffey where to drive. Costa saw them wipe off two guns with a towel that had been in the car. Costa also saw them hide the towel and guns in the woods. The men returned to the car and, according to Costa, both men threw out the sweatshirts they were wearing and the gloves that each had on one hand. The defendant threw a baseball batting glove from the window of the car that was similar to a glove later found by the police at Hendricks's home. Costa stated that, after the shooting, the defendant telephoned a friend, Frank Avant, and said, "We just got that nigger TV, and I'll

call you when I get to my spot." Avant testified that the defendant said, "Me and Son [the nickname for Hendricks] just dumped on Tony Vaughan."[4] The defendant also said that he "had a nine" and that he had "emptied."[5] The defendant stated that the police were all over the area looking for them. Avant could hear Hendricks's voice in the background during the conversation. Coffey and Costa testified that the defendant made several other calls from a cellular telephone. A supervisor from a cellular telephone service provider confirmed that a number of telephone calls were made from a cellular telephone accessible to the defendant shortly after 3 A.M. on August 19, 2000, in the Mashpee-Barnstable area.

Bergstrom, who heard six or seven gunshots about ten minutes after the victim had left her house, called the Falmouth police. The police found the victim slumped over the wheel of her vehicle (a Jeep similar to the one driven by Vaughan) in the Bergstrom driveway with the motor running and the headlights on. The bullets fired at her had copper jackets, indicating that they would cause significant damage on impact. A lead core and bullet jacket were recovered from her head. Numerous shell casings and spent bullets were found on the driveway, the Bergstrom house, and the window sill of a neighboring house. The casings found in the Bergstrom driveway were from a nine millimeter handgun the police later recovered at the defendant's direction.

When the defendant was interviewed by the police, he initially gave them a false name. According to a statement he gave to the police, he was unaware that a shooting was about to occur and he blamed the shooting on Hendricks and Avant. (The police ruled out Avant as a suspect.) Later, he took the police to the wooded area where a towel and the nine millimeter handgun involved in the shooting were recovered.[6,7]

The codefendant Hendricks testified. He said he knew that

---

[4]Avant understood "dumped on" to mean shot.

[5]Avant understood "emptied" to mean he had fired all his rounds.

[6]Costa assisted the police in the investigation, including showing them the wooded area where she had observed the defendant and Hendricks hide the guns.

[7]All the ballistics evidence recovered, including the jacket of the bullet found in the victim's head, came from the nine millimeter handgun that was

the defendant carried a weapon but did not know the defendant to use it. He admitted to being with the defendant at Bergstrom's driveway when shots were fired. He said that when they were next to a Jeep, he heard gunshots, but denied doing any shooting himself. He said the defendant "let off a few rounds," but that he did not know who was being shot. He said he "spun" and fell and was running and that he and the defendant got back into Coffey's car and later pulled over and got out of the car. He said they then drove the defendant to another town. Hendricks did not know that anyone had been killed or hurt until the next day.

*Severance.* Relying on *Commonwealth* v. *Moran*, 387 Mass. 644, 655-661 (1982), the defendant claims that he was deprived of his Federal and State constitutional rights to due process and a fair trial by the judge's refusal to sever his trial from that of Hendricks.[8] He contends that their defenses were mutually antagonistic and that the only realistic defense of each was to shift the blame to the other.

"In this Commonwealth severance is usually a matter within the sound discretion of the trial judge. . . . Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice time and energy to serve upon juries, and avoids the necessity of recalling witnesses to successive trials. . . . Such considerations, however, must yield at some point to the rights of the accused. That point is reached when the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial. In such circumstances, and upon the making of a timely motion, failure to sever constitutes an abuse of discretion." (Citations omitted.) *Commonwealth* v. *Moran, supra* at 658. Severance is required when defenses of defendants, tried jointly, are "mutually antagonistic and irreconcilable[, because t]he prejudice to each defendant [is] compelling." *Id.* at 659. Defenses are mutually

hidden in the woods. The lead core of the bullet in the victim's head could not be traced to any weapon. A jacket and its core can be separated when the bullet passes through a hard surface.

[8] "[T]he holding of *Moran* upon which the defendant relies was not based on either State or Federal constitutional law." *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 852 n.12 (1988).

antagonistic (or mutually exclusive) and irreconcilable where "[t]he sole defense of each [is] the guilt of the other." *Id.* at 656, quoting *United States* v. *Crawford*, 581 F.2d 489, 492 (5th Cir. 1978).

Even in the face of inconsistent defenses, our law on severance permits exceptions. "[N]o matter how inconsistent or antagonistic the defenses or trial strategies of the two defendants, there is no compelling prejudice and therefore no requirement of severance where the jury were warranted in finding [the defendant] guilty . . . on the basis of . . . eyewitness testimony [and other evidence]." *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 853 (1988). Assuming, without necessarily deciding, that the defenses in this case were inconsistent, even mutually exclusive, we conclude that there was no abuse of discretion because any prejudice resulting from the joint trial was not "so compelling that it prevent[ed] [the] defendant from obtaining a fair trial." *Commonwealth* v. *Sinnott*, 399 Mass. 863, 874 (1987), quoting *Commonwealth* v. *Moran, supra* at 658.

In *Moran*, there were no witnesses to the assault but the defendants; each defendant testified and essentially blamed the other for the killing; and the Commonwealth's case tended to prove "that at least one defendant, but not necessarily both of them, robbed and killed [the victim]." *Commonwealth* v. *Moran, supra* at 659. In the present case, by contrast, there was an eyewitness, Costa, who testified that she saw both men shooting. There was significant additional evidence supporting the fact that the defendant was the shooter.[9] Coffey stated that immediately after the shooting the defendant said, "I think I got that nigger's girl. She's three months pregnant." Similarly, Costa said she heard the defendant say, "We got that nigger, TV [Tony Vaughan]." Both men ran back to the car after the shooting, jumped in, and both said, "go, go, go." Costa testified that both men hid the guns and a towel used to wipe the guns down in the woods. She also testified that both men threw out their sweatshirts and the gloves each wore on one hand. Further, she heard the defendant say to Avant, "We just got that nigger TV,

---

[9] Of course, impeachment testimony was offered, but the evidence independent of that provided by Hendricks was sufficient to convict the defendant.

and I'll call you when I get to my spot." Avant essentially confirmed the conversation, stating that the defendant said, "me and son (Hendricks's nickname) just dumped on [shot] Tony Vaughan," that he (the defendant) "had a nine," and that the defendant had "emptied" (fired all his rounds). The defendant later brought the police to the wooded area where a towel and the nine millimeter handgun involved in the shooting were recovered.

Other testimony demonstrated the defendant's intent to kill Vaughan. The night before the shooting, he directed Leighton-Mendes to drive around looking for Vaughan and to drive down Harvard Drive, past Bergstrom's house. The defendant had a gun in his lap as they drove slowly by Bergstrom's house, and Robillard testified that the defendant said, "[W]ait until next time I see Tony. Watch." On the night of the shooting, Coffey said she felt the defendant holding a gun on her hip.

*Sufficiency of evidence of principal liability.* At the conclusion of the Commonwealth's evidence, the defendant moved for a required finding of not guilty on the theory of principal liability. The judge denied the motion and later submitted the case to the jury on theories of both principal and joint venture culpability. The jury returned a general verdict convicting the defendant of murder in the first degree on the theory of deliberate premeditation. The defendant argues that the evidence at the close of the Commonwealth's case did not support the theory of principal liability. We conclude otherwise.

In reviewing the denial of a motion for a required finding of not guilty, we review to determine whether the evidence, viewed in a light most favorable to the Commonwealth, could have satisfied a rational trier of fact of each element of the crimes charged beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). Inferences from the evidence "need only be reasonable and possible; [they] need not be necessary or inescapable." *Commonwealth* v. *Lodge*, 431 Mass. 461, 465 (2000), quoting *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998). For a conviction of murder in the first degree based on a theory of deliberate premeditation, the Commonwealth must prove beyond a reasonable doubt that the defendant committed an unlawful killing, that the killing was committed with malice, and that the killing was committed with

deliberate premeditation. *Commonwealth* v. *Simpson*, 434 Mass. 570, 586 (2001). Malice in this context means an intent to cause death. Model Jury Instructions on Homicide (1999).

For purposes of a motion for a required finding of not guilty, filed at the close of the Commonwealth's case, we determine whether the Commonwealth has sustained its burden of presenting sufficient evidence to support a verdict based on principal liability by examining the evidence at the close of the Commonwealth's case-in-chief. *Commonwealth* v. *Berry*, 431 Mass. 326, 330 (2000).[10]

The Commonwealth presented sufficient evidence for a rational jury to find beyond a reasonable doubt that the defendant was the shooter. The evidence recounted above in the discussion of the severance issue warrants a finding that the defendant formed a plan to murder, made a decision to kill after a period of deliberation, and then resolved to kill. See *Commonwealth* v. *Diaz*, 426 Mass. 548, 552-553 (1998). That evidence, together with Costa's testimony that she saw both men shooting, supports a finding of principal liability.

*Statement made to Hendricks.* The defendant claims that a statement made to Hendricks was improperly admitted. The background concerning this statement is as follows. Leighton-Mendes testified that, shortly after the murder when she was driving with Hendricks and Robillard, they encountered Vaughan and his friend Russell Rose in another car. The defendant's objection to Leighton-Mendes testifying to the conversation was overruled and, in a sidebar discussion, the Commonwealth represented that Leighton-Mendes would testify that Rose told Hendricks to "tell his friend he was a bad shot" and that "the wrong car was hit," and that Hendricks replied "okay" to the statement. The sidebar colloquy was somewhat opaque. Giving the defendant the benefit of the doubt, it appears that he alerted the judge to the two-fold problem with the statement: it was not adopted by Hendricks and it was not made in furtherance of the

---

[10]As the verdict slip was a general one, the evidence must be sufficient to support both joint venture and principal liability. Cf. *Commonwealth* v. *Berry*, 431 Mass. 326, 333 (2000). Although no issue is raised on appeal concerning sufficiency of the evidence of joint venture, pursuant to our duty under G. L. c. 277, § 33E, we have concluded that sufficient evidence supports the joint venture theory.

joint venture. The judge assured counsel that he would instruct the jury that they could use the statement only if they found it was part of the "general plan and scheme." The judge then instructed that the statement made by Rose to Hendricks when the defendant was not present "may be admissible to establish a joint venture. However, that statement in and of itself, if there is no other evidence with respect to establishing a joint venture theory cannot be used against Mr. Stewart. I'll give you a more detailed instruction later on at the close of the trial that will explain in detail the joint venture theory and what evidence you can use with respect to it . . . ." Although the judge promised additional instruction about the use of the statement, none was forthcoming.[11]

The Commonwealth contends that Hendricks's statement to Rose constituted an adoptive admission of Rose's remarks. Adoptive admissions are a "well-established" and "firmly rooted" exception to the hearsay rule. *Commonwealth* v. *Babbitt*, 430 Mass. 700, 705, 706 (2000). "The exception applies to any statement made in the presence of the defendant to which the defendant's response — whether by oral declaration, by gesture, or by revealing silence — objectively denotes the defendant's acceptance of the statement." *Id.* at 705. Even assuming that Hendricks's "okay" constituted an adoptive admission, the defendant was not present at the time the statement was made and took no part in adopting it. "Out-of-court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it." *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994). The jury were never instructed as to the prerequisites for their consideration of the testimony. There was no evidence that the statements were made in furtherance of the joint enterprise, and the jury was not aware that they could not use the statements against the defendant without such evidence. This was error. We must now determine whether this error was prejudicial. See *Commonwealth* v. *Flebotte*, 417

---

[11]In his final instructions to the jury at the close of the trial, the judge did not include any remarks about the statements made to Hendricks. The defendant did not alert the judge to his omission or object to the charge in this respect. Although it is unclear whether the objection was preserved, we treat it as preserved.

Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983) ("An error is nonprejudicial only '[i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected' ").

There was substantial other evidence, recounted above, that the defendant had shot the victim. Based on the other properly admitted evidence, we are convinced "that the error did not influence the jury, or had but very slight effect," and can say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte, supra* at 353.

*Examination of Commonwealth witness.* The defendant claims that there was prosecutorial misconduct in a question put to Leighton-Mendes concerning whether she had visited the victim's grave. Hendricks's attorney objected, but his objection was overruled. Because the objection was overruled and the question was permitted by the judge, the issue is not one of prosecutorial misconduct, rather, whether the judge erred in admitting the statement. The issue was irrelevant and the statement inadmissible for that reason. The defendant's counsel, however, did not object to its admission. The testimony was a minor point on a collateral issue and did not create a substantial likelihood of a miscarriage of justice.[12] *Commonwealth* v. *Thompson*, 431 Mass. 108, 117 (2000).

*Cross-examination of Commonwealth witness.* During cross-examination, Leighton-Mendes testified that because of her psychiatric condition, she did not know what she was saying,

---

[12]In the heading of his argument on this issue, the defendant states that the prosecutor's opening statement was improper, but makes no further reference to this issue in the body of his argument. The defendant also asserts prosecutorial misconduct from the phrase "assassination of the victim." He provides no record citation to this phrase and the words do not appear in the prosecutor's opening or closing argument or in the examination of Leighton-Mendes, the only witness referred to in the heading of this section of the defendant's argument. These parts of his argument do not comply with the requirements of Mass. R. A. P. 16 (a) (4), as amended, 357 Mass. 921 (1975), and are not considered. See *Commonwealth* v. *Keohane*, 444 Mass. 563, 572 n.6 (2005).

she often suffered blackouts, and she had no idea whether her testimony was true. She expressly admitted to testifying falsely. On appeal, the defendant claims that because of Leighton-Mendes's mental problems, he was not given an opportunity to cross-examine her properly, and that this denied him his confrontation rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. As there was no objection to Leighton-Mendes testifying, and no motion to strike her testimony as that of an incompetent witness, we must determine whether her testimony raises a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Randolph*, 438 Mass. 290, 294 (2002).

In view of the fact that Leighton-Mendes admitted on cross-examination that her testimony lacked credibility, the defendant accomplished all that possibly could be gained through cross-examination. He was not denied his right of confrontation.[13]

*Prior bad acts.* At trial, Bergstrom, a friend of Vaughan, testified, over objection, that the defendant threatened to kill her and her daughter because of her relationship with Vaughan. The defendant alleges that this evidence was improperly admitted because it was evidence of a prior bad act, and even if the evidence was relevant, its prejudice outweighs its probative value. See *Commonwealth* v. *Weichell*, 390 Mass. 62, 74-75 (1983), cert. denied, 465 U.S. 1032 (1984), *S.C.*, 446 Mass. 785 (2006).

Evidence of prior bad acts may not be introduced to suggest the accused's propensity to commit the crime charged. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence may be admissible, however, if relevant for some other probative purpose, including to show intent, motive, or state of mind. See *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999). These determinations are left to the discretion of the trial judge, see *Commonwealth* v. *Marrero*, 427 Mass. 65, 67-68 (1998), whose decision to admit such evidence will be upheld absent clear error. See *Commonwealth* v. *DelValle*, 443 Mass. 782, 790 (2005). Here, Bergstrom's testimony about the

---

[13]Leighton-Mendes's testimony concerned only the events of the night preceding the murder, was corroborated by that of other witnesses, and provided no incriminating evidence on the crucial issue whether the defendant shot the victim.

defendant's threat was relevant to show the defendant's hostile state of mind toward Vaughan and his possible motive. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 585 (2003). No limiting instruction as to the use of the testimony was requested, see *id.*, and, given the other strong evidence that the defendant disliked Vaughan and was seeking to kill him, its absence does not create a substantial likelihood of a miscarriage of justice.

The defendant also challenges the admission in evidence of the Bergstrom statement on the ground that its prejudicial effect outweighed its probative value. See *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990). A judge's decision in this area will be upheld "except for palpable error," *Commonwealth* v. *Young*, 382 Mass. 448, 462-463 (1981), and we discern no such error here.

The defendant contends that Hendricks's testimony about the murder of Juertas was improperly admitted. Hendricks testified that he had heard that Juertas was shot because Juertas and the defendant had robbed Vaughan. (The inference from this testimony is that the defendant targeted Vaughan in retribution for Juertas's shooting.) The defendant moved to strike Hendricks's testimony; the judge ruled that the statement was not offered for the truth of the matter. Defense counsel requested a limiting instruction and the judge instructed that "statements [that are] a matter of opinion by this witness with respect to the other defendant . . . you have the right to believe or disbelieve those statements." Later, at the request of the defendant, the judge instructed that the statement was only relevant to Hendricks's state of mind and was not admissible for its truth.

Hendricks's testimony regarding the motive for the shooting, if relevant to anything, was admissible only to prove his own state of mind. The judge's first instruction was incorrect. The statement was not admissible as an opinion. See *Commonwealth* v. *Lewis*, 286 Mass. 256, 257 (1934) (witness may not render opinion about another person's state of mind). See also *Commonwealth* v. *Carver*, 33 Mass. App. Ct. 378, 383 (1992).

We conclude, however, that the improper admission of the evidence did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Evans*, 438 Mass. 142, 152-153 (2002), cert. denied, 538 U.S. 966 (2003). The improperly

admitted evidence provided the jury the reason for the shooting. But the fact of hostility between the defendant and Vaughan was well established by the testimony of other witnesses, as was the defendant's desire to kill Vaughan. The reiteration by Hendricks of the fact that the defendant had a motive to do Vaughan harm was cumulative; the added testimony concerning the reason for the dislike (the robbery of Vaughan) has no independent importance.[14]

*Closing argument.* The defendant maintains that the following portion of the prosecutor's closing argument constituted improper vouching for the credibility of the witnesses:

> "And if anything I say to you in discussing the law doesn't agree with ultimately what the court says to you the law is, then disregard what I say. He's the judge of the law. You're the judge of the facts. All right?
>
> "But ladies and gentlemen, I took some pains to try to get at what exactly was said on the record from this witness stand by these witnesses in order to have a discussion with you about it this morning. We're going to talk about that."

Improper vouching occurs if "an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury." *Commonwealth* v. *Guy*, 441 Mass. 96, 112 (2004), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). The defendant asserts that the statement that the prosecutor "took pains" to review the record to ascertain the statements of the witnesses constitutes improper vouching. There was no objection to the closing argument, but even had the defendant objected, it would have made no difference. The statement did not constitute improper vouching for the credibility of the witnesses. The

---

[14]Later, at the request of the defendant, the judge instructed that Hendricks's testimony about the motive for the shooting was only relevant to his state of mind and was not admissible for its truth. This statement directly contradicted the earlier instruction (that the jury could believe this opinion "with respect to the other defendant"). We need not decide whether the later instruction cured the first, or only served to confuse the jury. We have concluded there was no substantial likelihood of a miscarriage of justice from the admission of the statement in any event.

prosecutor was merely indicating that he had studied the record to present his closing argument.

*Voir dire of jurors.* At one point during the trial, defense counsel informed the judge that two members of the jury might have seen the defendant in the lockup. Upon inquiry by the judge, a court officer confirmed that the lockup door was opened when the defendant was in the lockup, but no one could ascertain that any juror saw the defendant inside. Defense counsel requested an individual voir dire of the jury to determine if anyone had indeed seen the defendant in the lockup. Instead, the judge asked the panel collectively if anyone had seen anything while "coming into court or leaving court" that would have affected their impartiality. There was no response and the judge reiterated the question by asking whether it was unanimous, and again received no response.

We set forth in *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978), the procedure to be followed when a claim of extraneous influence on the jury is brought to the attention of a trial judge. The judge should first "determine whether the material . . . raises a serious question of possible prejudice." *Id.* If the judge so determines, a voir dire examination of the jurors should be conducted. *Id.* The voir dire may be conducted collectively, but if a juror indicates exposure to the extraneous information, an individual voir dire is then required. *Id.* See *Commonwealth* v. *Tennison*, 440 Mass. 553, 557-560 (2003). The judge here followed the established procedure. From his questioning of the jurors we infer that he found that the potential sighting of the defendant raised a "serious question of possible prejudice." He then asked the jury collectively if anything had occurred to affect their impartiality. This was a delicate attempt to ascertain whether any juror had viewed the defendant in the lockup. There was no response and the judge was required to proceed no further. See *id.*

*Ineffective assistance of counsel.* In his motion for a new trial, the defendant claimed that his trial counsel was ineffective and that numerous errors of that counsel cumulatively affected the verdict. The defendant maintains that the judge erred in denying the motion. To prevail on a claim of ineffective assistance of counsel, a defendant must show that "better work might have

accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 & n.10 (1977), citing *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). The most serious error alleged is counsel's failure to move for severance when mutually antagonistic defenses could prejudice the defendant. A motion for severance was filed on behalf of Hendricks and was denied on the first day of trial.

The defendant challenges defense counsel for not filing a motion for severance, although he concedes that defense counsel orally joined in Hendricks's motion to sever immediately prior to the beginning of the trial. It is not clear from the record that the defendant did join in Hendricks's motion to sever. The defendant did, however, alert the judge to the severance issue during Hendricks's counsel's opening statement (the point at which defense counsel indicates that he first became aware that Hendricks would testify). In any event, we have concluded that there was no abuse of discretion in the denial of severance, and consequently the filing of such a motion would not have accomplished anything for the defense. *Commonwealth* v. *Satterfield*, *supra.*

The defendant contends also that trial counsel was unprepared for trial, referring specifically to the fact that his counsel did not file discovery motions or other motions. The pretrial conference report filed with the court indicates that the Commonwealth had provided routine discovery and the docket states that counsel filed motions for funds for an investigator, a ballistics expert, and a psychiatric examination. He also filed motions for criminal records of certain witnesses and a motion for disclosure of rewards, inducements, or promises. Counsel testified at the motion for a new trial that his investigator conducted extensive investigation. The record indicates that counsel submitted requests for jury instructions and memoranda in support thereof. The claim of lack of preparation by trial counsel is not supported by the record.

The defendant maintains additionally that his attorney should have subpoenaed psychiatric records of Leighton-Mendes to impeach her credibility. On cross-examination by the defendant's trial counsel, Leighton-Mendes admitted that she had been institutionalized in a psychiatric facility for "issues that . . . cloud[ed her] ability to accurately speak to the police." She

stated that her blackouts caused her "to not know what [she] was saying." Because she was unable to recall many instances of talking with the police, she testified that she made statements that were "against [her] knowledge and also false" and that "anything that [she] said to the police prior to this probably is tinged with not even knowing what's going on." In view of this testimony, it is difficult to imagine that psychiatric records could have provided more damaging impeachment. Cf. *Commonwealth* v. *Joyce*, 382 Mass. 222, 229-231 (1981) (introduction of prior records essential; no other means to elicit bias of witness).

The defendant states that his counsel did not file motions in limine or jury instruction requests concerning prior bad act testimony or hearsay. Specifically, he refers to testimony that he had threatened Bergstrom and that he carried a gun at other times. The record indicates that counsel objected numerous times to testimony regarding threats and the defendant's possession of a gun. Many of these objections were sustained. Other testimony from witnesses who saw the defendant with a gun was relevant and thus admissible. See *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 492-493 (1977).

Apart from the above, the defendant makes a general claim that his lawyer was not organized or prepared and did not present a coherent defense. The defendant has not provided any specifics and our review of the records indicates that his contention is unsupported. Defense counsel investigated and prepared the case and worked to present a defense. The defendant was faced with an eyewitness to the murder, numerous witnesses to his hostility to Vaughan, and his inculpatory statements. The failure of the defense was not due to lack of preparation or effort by defense counsel, but to weaknesses in the facts. See *Commonwealth* v. *Satterfield, supra*.

*Relief under G. L. c. 278, § 33E.* We have reviewed the record with care. There were a number of errors during the trial, but in view of the strong evidence against the defendant, the errors, even considered cumulatively, did not deprive him of a fair trial. We decline to exercise our extraordinary power to reduce the verdict or order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*