## COMMONWEALTH *vs.* LUIS VASQUEZ
## (and five companion cases[1]).

Suffolk. March 9, 2012. - July 17, 2012.

Present: IRELAND, C.J., SPINA, CORDY, DUFFLY, & LENK, JJ.

*Homicide. Rape. Duress. Practice, Criminal,* Capital case, Instructions to jury, Severance, Trial of defendants together, Challenge to jurors, Disqualification of judge, Required finding. *Jury and Jurors. Evidence,* Statement of codefendant, Expert opinion.

At a murder trial, the judge properly instructed the jury regarding duress and did not err in declining to give a requested instruction regarding duress, where duress is not a defense to deliberately premeditated murder, murder committed with extreme atrocity or cruelty, or murder in the second degree, and where this court discerned nothing in the defendant's conviction that suggested that relief under G. L. c. 278, § 33E, might be appropriate. [832-836]

At a murder trial, the judge did not abuse his discretion in denying the motions of two defendants to sever their trial from the trial of a third defendant, where the defenses were not mutually antagonistic and irreconcilable, and where sufficient other evidence of guilt existed. [836-838]

At a criminal trial, no error arose from the granting of the Commonwealth's peremptory challenge to a juror who had not accurately disclosed his criminal offender record information (CORI) on his juror questionnaire form, where the prosecutor had independent authority to conduct checks of jurors' CORI records before the jury were sworn, and where the prosecutor announced in advance of jury selection that he would be checking selected jurors' CORI records and providing such records to all counsel. [838-839]

The judge at a criminal trial did not abuse his discretion in declining to recuse himself, where nothing in the record suggested that he was prejudiced against any defendant, and where the manner in which the judge conducted a witness's plea colloquy was correct. [839-841]

At a murder trial involving multiple defendants, the admission in evidence of a statement that one nontestifying defendant made to police did not violate a second defendant's constitutional right to confront witnesses against him, where the statement made no express reference to the second defendant and did not obviously refer directly to him; where the statement did not undermine the second defendant's alibi defense; and where the jury could be presumed to follow the judge's limiting instruction that the statement

---

[1]Two other indictments against Luis Vasquez, two against Ismael Vasquez, and one against Scott Davenport. We shall refer to Luis and Ismael by their first names.

could be considered only in the Commonwealth's case against the nontestifying defendant. [841-844]

At a murder trial, the judge did not abuse his discretion in denying, without an evidentiary hearing, the defendants' motion to exclude blood spatter evidence, where such evidence was generally accepted as reliable within the relevant scientific community. [844-846]

At the trial of indictments charging, inter alia, rape, sufficient evidence existed to permit the jury to find beyond a reasonable doubt that the victim had sex with the defendant because she was fearful of what would happen if she did not submit to him. [846-847]

This court discerned no reason to reduce the degree of guilt on the defendants' murder convictions or to order a new trial for any of the defendants. [847]

INDICTMENTS found and returned in the Superior Court Department on December 20, 2001.

Motions to sever and for reconsideration were heard by *Patrick F. Brady*, J., and the cases were tried before him.

*Stephen Paul Maidman* for Ismael Vasquez.

*David A.F. Lewis* for Luis Vasquez.

*Kevin S. Nixon* for Scott Davenport.

*Zachary Hillman*, Assistant District Attorney (*Patrick M. Haggan*, Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. Following internal upheaval in a gang, five gang members and a nonmember associate executed a sixth member. Two other members[2] testified against the others pursuant to cooperation agreements with the Commonwealth. Scott Davenport (Davenport), the nonmember who also killed the victim, testified that he acted under duress. Following a joint trial of four defendants, the jury found all defendants guilty of murder in the first degree, as well as other crimes.[3] On appeal, Davenport claims he was entitled to an instruction on duress as a defense to murder. Luis Vasquez (Luis) and Ismael Vasquez

[2]Ana White and Lauren Alleyne.

[3]Luis was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, kidnapping, and aggravated rape. Ismael was convicted of deliberately premeditated murder and kidnapping. Scott Davenport was convicted of murder in the first degree by extreme atrocity or cruelty. Harold Parker was convicted of deliberately premeditated murder and kidnapping. Parker's appeal has been severed from these appeals.

(Ismael) argue that their respective defenses were mutually antagonistic and irreconcilable with Davenport's defense of duress, and their trials should have been severed. They also argue that a single justice of this court erred by directing the trial judge to permit the Commonwealth to exercise a peremptory challenge against a juror who failed to make complete disclosure of his criminal record on his juror questionnaire, where the prosecutor discovered the juror's omission after declaring his satisfaction with the juror but before the jury were sworn. Ismael argues separately that the judge erred by denying his motion for recusal based on statements the judge made during a plea colloquy with Ana White, who testified pursuant to a cooperation agreement. Luis argues separately that the judge erred by (1) admitting a statement of the defendant Harold Parker (Parker), in violation of the rule in *Bruton* v. *United States*, 391 U.S. 123 (1968); (2) denying his request for a hearing pursuant to *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), to challenge the reliability, and thus the admissibility, of expert opinion testimony on bloodstain pattern analysis, also known as blood spatter analysis; and (3) denying his motions for a required finding of not guilty as to the charge of aggravated rape, where he asserts the evidence was not sufficient to prove that the victim did not consent to natural and unnatural sexual intercourse. We affirm the convictions and decline to grant relief pursuant to G. L. c. 278, § 33E.

1. *Background.* We recite the facts that the jury could have found. We reserve certain details for discussion of particular issues. In the fall of 2001, an area in the Harvard Square area of Cambridge known as "The Pit" was a popular meeting place for young people, many of them homeless. Among them were Io Nachtwey, the victim, and Gene Bamford (Bamford), her boy friend. In mid-to-late October, 2001, newcomers Parker and Ismael appeared and announced a plan to form a new "Crips set," a gang, in Harvard Square. They ousted the existing local leader of the Crips and began recruiting people who frequented "The Pit." Among those recruited were Ana White (White), Lauren Alleyne (Alleyne), Bamford, and the victim.

The newly formed gang met on Halloween in a cemetery near Harvard Square. Ismael, Parker, and Bamford led the meeting,

which consisted of an induction ceremony. The meeting moved to a motel in Braintree, where Ismael, Parker, and Bamford explained the rules of the gang. This included the performance of "missions," whereby members would rob people of money to support the gang. A member who failed at a mission would receive a "violation" accompanied by a punishment. For the first two violations, punishment would consist of a beating. Punishment for a third violation would be death. If the violating member could not be found, then punishment would be meted out against those closest to that member. Certain "marriage" ceremonies then took place, including Ismael to White, Parker to Alleyne, and Bamford to the victim. Ismael, Bamford (whom Ismael appeared to favor), and Parker were the gang's leaders, in descending rank.

The next day, November 1, 2001, gang members were sent on missions to rob people. The victim did not participate because she was considered too childlike and a likely burden on the missions. None of the missions was successful, which upset Ismael and Parker. One of the members was given a violation and beaten later that night during a meeting at the cemetery. The members were instructed to go back into the streets and collect money. Ismael introduced Luis as an overseer of the gang. Eventually, one of the sorties was successful, and the gang went to a diner to celebrate. Afterward, they retired for the night to the motel.

On the morning of November 2, Ismael assigned missions to gang members. He sent one group, led by Bamford, to Harvard Square to get money by any means, and report back that night. The victim remained at the motel with Luis, Ismael, and Parker. Alleyne went with Bamford's group to Harvard Square. While in Harvard Square, Bamford and his group learned that Luis, Ismael, and Parker were members of the Latin Kings gang, and that they were organizing a "false" set of Crips to send on "suicide missions." One member of Bamford's group asked the others to reject their Crip flags. Bamford's group devised a plan to obtain a gun and rescue the victim from the motel.

On November 3, Alleyne, who had been with Bamford's group the day before, went to the motel and informed Luis, Ismael, and Parker of Bamford's plan. The three men were furious.

Ismael made arrangements with his friend, Davenport, to use his vehicle in exchange for heroin. The group drove to Lawrence. While the four men went to get heroin for Davenport, the victim, White, and Alleyne waited at the home of Ismael's sister in Lawrence. There, the victim told White and Alleyne about a dream she had of blood dripping from a tree. She said she interpreted her dream to mean she knew Bamford would turn against the group. White became angry.

After the men returned and picked up the three women, the group drove toward Boston. On the way, White demanded that the victim tell the men about her dream. This worried the victim. Ismael asked the victim to explain, so she related what she had told White and Alleyne earlier. She added that they did not have to worry about her because she was their friend. The victim tried to get out of the car when it stopped at a red light. Ismael told the others not to let her out. White prevented the victim from leaving.

The group stopped at a park. The men walked off to confer while the women waited at a park bench. When they returned, Ismael asked the victim to repeat the description of her dream. The men again walked off. The victim asked White and Alleyne what was going to happen. When the four men returned, she pleaded with them to allow her to prove herself. Ismael showed her a knife and said she had to get Bamford. The group then started toward the car. As they were walking, Parker told White and Alleyne that they were going to "get" the victim. He instructed them that, when they heard the words "green light," they were to pull the victim to the ground and hold her down while Davenport stabbed her. The group returned to the car. Luis drove to a side street in Cambridge near the Boston University Bridge, which spans the Charles River. One of the men said the group was going for a walk. Luis and the victim separated from the others. Luis had sexual intercourse with the victim, and she performed fellatio on him. Ismael said to Davenport, "You know what you have to do." Ismael repeated for White and Alleyne the plan that Parker had directed them to carry out, adding that they should walk with the victim along the tracks on the railroad bridge under the Boston University Bridge. Davenport said he did not want to kill the victim, but

Ismael handed him a knife with a ten-inch blade and told him, "You're not getting out of here if you don't."

As the women walked along the tracks the victim told White and Alleyne that she loved Luis and could not believe she had ever been with Bamford. Although she professed to be happy, she appeared frightened and asked the women what was going to happen to her. As they neared the half-way point on the railroad bridge Ismael shouted "green light." White and Alleyne pushed the victim onto the tracks, held her down, and covered her mouth. Davenport ran toward them. He shouted, "Die, die, bitch, die," and stabbed her repeatedly. The victim screamed. She tried to protect herself by raising her knees to her chest. White and Alleyne tried to muffle her voice, but the victim kept screaming and begged them to stop.

Luis ran up the tracks and told them, "Get the fuck out of there." He struck the victim several times in the head with a pair of "nunchucks" as Davenport continued to stab her. The victim sustained several stab wounds, incised wounds, and defensive wounds, in addition to multiple lacerations and blunt force trauma to her head. After she stopped moving, Luis and Davenport threw her body into the river below. Ismael directed White to make sure she was dead. White went to the edge of the river. She saw the victim floating face down and motionless. Davenport ran his hands through his hair and exclaimed, "What a rush!" White and Alleyne sang on the way back to the car. Ismael proclaimed, "This is real, no turning back now. Blood in, blood out."

2. *Duress.* Davenport argues that the judge erred by instructing the jury: "Duress . . . is not a defense to first degree murder, either under the theory of [deliberate] premeditation or by extreme atrocity or cruelty. Likewise, duress does not . . . excuse the intentional murder of an innocent person." Davenport objected to this instruction. He also objected to the judge's refusal to instruct the jury, as requested, that duress is a defense to murder, and alternatively, that duress may mitigate murder to manslaughter. He asks us to recognize duress as a defense to intentional murder, a question we have not previously considered.

Duress has been defined as a present, immediate, and pending threat of such a nature as to induce a well-founded and

reasonable fear of death or serious bodily injury if the criminal act is not done, with no reasonable and available chance of escape, and where no person of reasonable firmness could have acted otherwise in the circumstances. See *Commonwealth* v. *Robinson*, 382 Mass. 189, 199-200 (1981), and cases cited. It is not available to a person who recklessly puts himself in a position where coercion probably will be applied. *Id.* at 200 n.11. See *Commonwealth* v. *Allen*, 430 Mass. 252, 256 (1999). "The rationale of the defense [of duress] is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Nor is it that the defendant has not engaged in a voluntary act. Rather it is that, even though he has done the act the crime requires and has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude." *United States* v. *LaFleur*, 971 F.2d 200, 205 (9th Cir. 1991), cert. denied, 507 U.S. 924 (1993), quoting W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 5.3 (1986).

"The 'choice of evils' rationale for the duress defense is strained when a defendant is confronted with taking the life of an innocent third person in the face of a threat on his own life. The choice of evils rationale necessarily presumes that the threatened harm to the defendant is greater than the resulting harm from the defendant's commission of the crime. When the defendant commits murder under duress, the resulting harm — i.e., the death of an innocent person — is at least as great as the threatened harm — i.e., the death of the defendant. For this reason, the common law rejected duress as a defense to murder."[4] *United States* v. *LaFleur*, *supra*, and cases and authorities cited.

The Supreme Court of California noted that that State "is tormented by gang violence. If duress is recognized as a defense

[4]Some courts have said duress may be a defense at common law to felony-murder insofar as it may be a defense to the predicate felony. See *Commonwealth* v. *Robinson*, 382 Mass. 189, 201 n.14 (1981), and cases cited; W.R. LaFave, Criminal Law § 9.7(b) (5th ed. 2003). We have not definitively addressed this issue. See *Commonwealth* v. *Allen*, 430 Mass. 252, 256 (1999).

to the killing of innocents, then a street or prison gang need only create an internal reign of terror and murder can be justified, at least by the actual killer. Persons who know they can claim duress will be more likely to follow a gang order to kill instead of resisting than would those who know they must face the consequences of their acts. Accepting the duress defense for any form of murder would thus encourage killing." *People* v. *Anderson*, 28 Cal. 4th 767, 777-778 (2002).

Every State appellate court, except one, that has decided whether duress may be a defense to murder under the State's common law has held that it is no defense to intentional murder.[5] The one court that has not so held determined only that duress may negate the specific intent to kill where the defendant was not the actual killer but aided and abetted the killer.[6]

Eighteen State Legislatures have recognized duress as a defense to crime, but have excluded it as a defense to intentional murder.[7] Three State Legislatures have recognized duress as a

---

[5]See *Arp* v. *State*, 97 Ala. 5 (1893); *Brewer* v. *State*, 72 Ark. 145 (1904) (superseded by Ark. Code Ann. § 5-2-208 [LexisNexis 2006]); *People* v. *Anderson*, 28 Cal. 4th 767, 772 (2002); *Wright* v. *State*, 402 So. 2d 493, 497-499 (Fla. Dist. Ct. App. 1981); *Luther* v. *State*, 255 Ga. 706, 708 (1986); *People* v. *Doss*, 214 Ill. App. 3d 1051, 1056 (1991); *McCune* v. *State*, 491 N.E.2d 993, 995 (Ind. 1986); *State* v. *Capaci*, 179 La. 462, 493-494 (1934); *Wentworth* v. *State*, 29 Md. App. 110, 118 (Ct. Spec. App. 1975); *People* v. *Dittis*, 157 Mich. App. 38, 40-41 (1987); *Watson* v. *State*, 212 Miss. 788, 792-793 (1951); *Jackson* v. *State*, 558 S.W.2d 816, 819-820 (Mo. Ct. App. 1977); *State* v. *Fisher*, 23 Mont. 540 (1900); *State* v. *Fuller*, 203 Neb. 233, 243 (1979); *State* v. *Brock*, 305 N.C. 532, 540-541 (1982), overruled on other grounds, *State* v. *Taylor*, 337 N.C. 597 (1994); *State* v. *Dissicini*, 126 N.J. Super. 565, 569-571 (1974), aff'd, 66 N.J. 411 (1975); *State* v. *Finnell*, 101 N.M. 732, 736-737, cert. denied, 469 U.S. 918 (1984); *State* v. *Getsy*, 84 Ohio St. 3d 180, 197-198 (1998); *State* v. *Weston*, 109 Or. 19, 34-37 (1923); *State* v. *Nargashian*, 26 R.I. 299 (1904); *State* v. *Rocheville*, 310 S.C. 20, 26, cert. denied, 508 U.S. 978 (1993); *State* v. *Robinson*, 622 S.W.2d 62, 73-74 (Tenn. Crim. App. 1980), cert. denied sub nom. *LeMay* v. *Tennessee*, 454 U.S. 1096 (1981) (superseded by Tenn. Code Ann. § 39-11-504 [2010]); *Pugliese* v. *Commonwealth*, 16 Va. App. 82, 95 (1993); *Amin* v. *State*, 811 P.2d 255, 260 (Wyo. 1991).

In noncapital cases, two States have noted that at common law, duress is not a defense to intentional murder. See *Nall* v. *Commonwealth*, 208 Ky. 700 (1925); *State* v. *Tanner*, 171 W. Va. 529, 532 (1982).

[6]See *Rizzolo* v. *Commonwealth*, 126 Pa. 54, 72 (1889) (superseded by 18 Pa. Cons. Stat. Ann. § 309 [West 1998] — making duress a defense to all crimes).

[7]See Ala. Code § 13A-3-30 (LexisNexis 2005); Ariz. Rev. Stat. Ann.

criminal defense, but have allowed it only as a partial defense to murder; that is, it may mitigate murder to manslaughter.[8] Thirteen State Legislatures have recognized duress as a complete defense to all crimes, including murder.[9]

Duress is not a defense to intentional murder under the common law of any State. The common law has steadfastly rejected duress as a defense to intentional murder. We are persuaded that, under our common law, a defendant is not excused from taking the life of an innocent person because of the threat of harm to himself. The judge did not err by refusing to instruct the jury that duress is a defense to murder, or by instructing them that duress is not a defense to murder.

Although we hereby reject duress as a defense to deliberately premeditated murder, murder committed with extreme atrocity or cruelty, and murder in the second degree, we do not foreclose the possibility that, in exceptional and rare circumstances of duress, justice may warrant reduction of a defendant's guilt in our review under G. L. c. 278, § 33E. We discern nothing in Davenport's conviction that suggests relief under G. L. c. 278, § 33E, might be appropriate. There was no evidence that Davenport did not have a reasonable and available opportunity to escape. See *Wright* v. *State*, 402 So. 2d 493, 497-498 n.6 (Fla. Dist. Ct. App. 1981). He acknowledged in his testimony

13-412(C) (West 2010); Cal. Penal Code § 26 (West 1999 & Supp. 2012); Colo. Rev. Stat. Ann. § 18-1-708 (West 2004); Ga. Code Ann. § 16-3-26 (2011); Idaho Code Ann. § 18-201(4) (Michie 2004); 720 Ill. Comp. Stat. Ann. § 5/7-11 (West 2011); Ind. Stat. Ann. § 35-41-3-8 (LexisNexis 2009); Iowa Code Ann. § 704.10 (West 2003); Kan. Stat. Ann. § 21-5206 (Supp. 2011); Ky. Rev. Stat. § 501-090 (LexisNexis 2008); La. Rev. Stat. Ann. § 14:18(6) (West 2007); 17-A Me. Rev. Stat. Ann. § 103-A (West 2006 & Supp. 2011); Mo. Ann. Stat. § 562.071 (West 1999); Mont. Code Ann. § 45-2-212 (2011); Nev. Rev. Stat. § 194.010(7) (2011); Or. Rev. Stat. § 161.270 (West 2003); Wash. Rev. Code Ann. § 9A.16.060 (West 2009).

[8]See Minn. Stat. Ann. §§ 609.08, 609.20(3) (2011); N.J. Stat. Ann. § 2C:2-9 (West 2005); Wis. Stat. Ann. § 939.46 (West 2005 & Supp. 2011).

[9]See Alaska Stat. § 11.81.440 (LexisNexis 2010); Ark. Code Ann. § 5-2-208 (LexisNexis 2006); Conn. Gen. Stat. Ann. § 53a-14 (West 2007); Del. Code Ann. tit. 11, § 431 (Michie 2007); Haw. Rev. Stat. Ann. § 702-231 (West 2008); N.Y. Penal Law § 40.00 (McKinney 2009); N.D. Cent. Code § 12.1-05-10 (LexisNexis 2012); 21 Okla. Stat. Ann. §§ 152, 155, 156 (West 2012); 18 Pa. Cons. Stat. Ann. § 309; S.D. Codified Laws Ann. § 22-5-1 (West 2006); Tenn. Code Ann. § 39-11-504; Tex. Penal Code Ann. § 8.05 (West 2011); Utah Code Ann. § 76-2-302 (LexisNexis 2008).

that he could have run past the women, who were ten yards in front of the men, and reached safety at the Boston end of the railroad bridge. He also acknowledged that he could have jumped off the bridge into the Charles River but did not do so because the water was cold. In addition, Luis, Ismael, and Parker did not have guns or weapons that could inflict injury beyond arm's length; and White and Alleyne had no weapons with which to impede his flight. Where escape was available to Davenport, duress does not lie, even if it were a recognized defense in the Commonwealth. Moreover, none of the other defendants actually threatened Davenport with a weapon and he offered no resistance, notwithstanding his possession of the largest knife among them. See *Brewer* v. *State*, 72 Ark. 145 (1904); *Wright* v. *State*, *supra*.

Davenport testified he did not know the victim and had no reason to kill her. She was an innocent person. Even after Luis told Davenport, White, and Alleyne to "get the fuck out of there," Davenport continued to stab the victim. After he helped Luis throw her body into the Charles River, he savored the moment. We see no reason to reduce the degree of his guilt or to grant him a new trial.

3. *Severance.* Luis and Ismael assert error in the denial of their motions to sever their trial from Davenport's trial. Luis argues that his alibi defense and Davenport's duress defense were mutually antagonistic and irreconcilable. Ismael argues that his defense that Davenport, White, and Alleyne killed the victim on their own initiative, and Davenport's duress defense, were mutually antagonistic and irreconcilable.

"Absent a constitutional requirement for severance, joinder and severance are matters committed to the sound discretion of the trial judge." *Commonwealth* v. *McAfee*, 430 Mass. 483, 485 (1999). Denial of a motion for severance is an abuse of discretion when "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth* v. *Moran*, 387 Mass. 644, 658 (1982). Severance is not mandated simply because defenses are hostile. Rather, severance is required only if the defenses are both mutually antagonistic (or mutually exclusive) and irreconcilable. *Id.* at 656, 659. Defenses are both mutually antagonistic and irreconcil-

able where "[t]he sole defense of each was the guilt of the other." *Id.* at 656, quoting *United States* v. *Crawford*, 581 F.2d 489, 492 (5th Cir. 1978). Similarly, they may be mutually antagonistic and irreconcilable "where the acceptance of one party's defense will preclude the acquittal of the other." *Commonwealth* v. *Moran, supra* at 656-657, quoting *United States* v. *Ziperstein*, 601 F.2d 281, 285 (7th Cir. 1979), cert. denied, 444 U.S. 1031 (1980). These conditions do not exist here.

The jury could have believed Davenport's testimony as to duress (assuming duress were a defense), but because there were multiple defendants they simultaneously could have believed Luis's alibi defense and believed that either Ismael or Parker, or both, coerced Davenport. Or the jury could have discredited both the duress and alibi defenses yet acquitted Luis and convicted Davenport on the strength of his own testimony, where the claim of duress was not particularly convincing. Luis's and Davenport's respective defenses neither compelled the conviction of the other nor precluded the acquittal of the other. Thus, Luis's alibi defense and Davenport's duress defense were not mutually antagonistic and irreconcilable.

With respect to Ismael's claim of prejudice from joinder, the jury could have believed Davenport killed the victim on his own initiative, without coercion from anyone, based simply on Davenport's own testimony. He admitted killing the victim, and there was no evidence that anyone threatened him with a weapon or cut off any chance of escape. Other testimony indicated he derived great satisfaction from the act. The evidence did not warrant a duress instruction even if it had been an available defense. Thus, the weakness in Davenport's duress defense arose from his own testimony and was not compelled by Ismael's defense that Davenport acted voluntarily and in conjunction with White and Alleyne. Similarly, the evidence of Ismael's guilt was not compelled by Davenport's testimony. Rather, Davenport's testimony concerning Ismael's involvement was at best cumulative of the testimony of White and Alleyne, which supported the existence of a joint venture on which the jury were instructed. Davenport's interest in the joint venture was the maintenance of good relations with his drug suppliers. Luis's and Ismael's interest was the organizational integrity of their newly formed gang.

The defenses of Davenport and Ismael did not compel the jury to accept one defense and reject the other. They could reject both.

In any event, as suggested above, even mutually antagonistic and irreconcilable defenses do not require severance if there is sufficient other evidence of guilt. See *Commonwealth* v. *Stewart,* 450 Mass. 25, 31 (2007); *Commonwealth* v. *Cordeiro,* 401 Mass. 843, 853 (1988). White and Alleyne provided considerable independent[10] evidence of the guilt of Luis and Ismael. The jury could have inferred that it would have been highly unlikely that Davenport could have injured any gang member, the victim in particular, in the presence of Luis or Ismael without their approval. Evidence of a joint venture to kill the victim was overwhelming, without Davenport's testimony. In light of that evidence and the fair inferences it supported, whatever prejudice that resulted from the joint trial was not "so compelling that it prevent[ed] [Luis and Ismael] from obtaining a fair trial." *Commonwealth* v. *Stewart, supra,* quoting *Commonwealth* v. *Sinnott,* 399 Mass. 863, 874 (1987). We conclude there was no abuse of discretion in the denial of Luis's and Ismael's motions to sever.

4. *Peremptory challenge.* Luis and Ismael assert error in the judge's allowance of the Commonwealth's exercise of a peremptory challenge against a juror with whom the Commonwealth had declared its satisfaction, but who the Commonwealth discovered before the jury were sworn had not accurately disclosed his criminal offender record information (CORI) on his juror questionnaire form. After a voir dire of the juror, the judge accepted the juror's explanation that he misunderstood the question on the form. The judge found the juror indifferent, and he denied the Commonwealth's request to challenge the juror for cause. The Commonwealth then attempted to exercise a peremptory challenge against the juror. This too was denied.

---

[10]There is no merit to the claim that because White and Alleyne had testified pursuant to cooperation agreements their testimony could not be considered independent for purposes of the application of *Commonwealth* v. *Stewart,* 450 Mass. 25, 31 (2007), and *Commonwealth* v. *Cordeiro,* 401 Mass. 843, 853 (1988). For purposes of severance, independent evidence is evidence that is not offered by one defendant against another at their joint trial. White and Alleyne were not being tried; they were Commonwealth witnesses. Had there been separate trials, they could have testified against each defendant. Their cooperation agreements went to the credibility of their testimony, not its independence.

The Commonwealth then sought relief in the county court pursuant to G. L. c. 211, § 3, and a single justice ordered the Commonwealth's challenge to be granted.

At the time of the 2005 trial, we had not yet issued our decisions in *Commonwealth* v. *Cousin*, 449 Mass. 809 (2007), cert. denied, 553 U.S. 1007 (2008), and *Commonwealth* v. *Hampton*, 457 Mass. 152 (2010).[11] In *Commonwealth* v. *Hampton, supra* at 170-171, which addresses all Ismael's arguments, we held that a prosecutor has independent authority to conduct checks of jurors' CORI records pursuant to G. L. c. 6, § 172, before the jury are sworn. We further held that, to avoid delay, "the prosecutor may reserve an entitlement to conduct a check of jurors' CORI records by declaring that he or she is content with the jury, subject to the results of such checks, which the prosecutor will cause to be completed immediately, no later than the beginning of the next trial day." *Commonwealth* v. *Hampton, supra* at 171. The single justice foreshadowed precisely this procedure in his memorandum and order.

Here, the prosecutor's only misstep was declaring he was content with the juror without reserving his entitlement to conduct CORI checks. However, there were virtually no appellate decisions in the Commonwealth on this subject at the time, and we had not yet formulated a procedure for these circumstances. Clearly, if the prosecutor had requested time to conduct the CORI checks, an accommodation would have been required. See *id.* Thus, even if there were error arising out of the prosecutor's "failure" to request that which had not yet become law, it did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The prosecutor had announced in advance of jury selection that he would be checking selected jurors' CORI records and providing such records to all counsel. It should have been obvious to all that this would occur overnight for use the next day.

The single justice did not err in ordering the Commonwealth's peremptory challenge to be granted. Consequently, there could be no error in the judge's execution of that order.

5. *Recusal.* Ismael argues that the trial judge erroneously

---

[11]Ismael and Luis did not have the benefit of *Commonwealth* v. *Hampton*, 457 Mass. 152 (2010), at the time they submitted their briefs.

denied Ismael's motion to recuse himself from the case. He contends that the judge undertook a prosecutorial role and rendered himself nonneutral as a result of a warning the judge gave to White during her plea colloquy. The judge told White that if she committed a breach of her cooperation agreement with the Commonwealth, a point that he, the judge, would decide, then she could be sentenced under her plea agreement to up to twenty years for manslaughter and up to a life sentence for kidnapping, from and after the manslaughter sentence.[12]

The judge first examined his own emotions and conscience, then considered whether his impartiality might reasonably be questioned, as required by the Code of Judicial Conduct, S.J.C. Rule 3:09, Canon 3 (E), as appearing in 440 Mass. 1319 (2003). See *Lena* v. *Commonwealth*, 369 Mass. 571, 575 (1976). He concluded that in the plea colloquy with White he had merely informed her of the maximum penalty to which she was exposed if the Commonwealth later argued that she did not honor the cooperation agreement. In the face of such an allegation, he would have to decide whether she had committed a breach of the cooperation agreement. This was a correct statement of law. The judge further observed that he merely did what was required of him legally at White's plea colloquy. See Mass. R. Crim. P. 12 (c) (2) (A), (c) (3) (B), 378 Mass. 866 (1979). He stated that he in fact remained impartial, and he correctly concluded that nothing he had done at White's plea colloquy reasonably could provide a basis to question his impartiality. He then denied Ismael's motion to recuse.

The judge's decision not to recuse himself is reviewable for an abuse of discretion. See *Commonwealth* v. *Adkinson*, 442 Mass. 410, 415 (2004). The defendant has failed to show that the denial of his motion to recuse was an abuse of discretion. The judge's self-searching is entitled to deference, and there is nothing in the record to suggest he was prejudiced against Ismael, or any defendant for that matter. The manner in which

---

[12]The Commonwealth had recommended a sentence of from twelve years to twelve years and one day on the manslaughter charge, and four years' straight probation on the kidnapping charge, to be served from and after the prison sentence. The recommendation was contingent on White's compliance with the cooperation agreement.

the judge conducted White's plea colloquy was correct. Therefore, no one reasonably could question his impartiality from the manner in which the plea colloquy was conducted. There was no error.

6. Bruton *issue*. Parker had made a statement to police, admitted at trial, in which he admitted being present at the scene of the crime and that he knew in advance that the victim would be killed. He told police that he had vocally opposed the decision to kill her, but "other members threatened to kill him." Parker did not testify at trial. Counsel for Luis objected to the words "other members" in Parker's statement on the ground that it violated Luis's right under the Sixth and Fourteenth Amendments to the United States Constitution to confront and cross-examine Parker, see *Bruton* v. *United States*, 391 U.S. 123 (1968) (*Bruton*); see also *Gray* v. *Maryland*, 523 U.S. 185 (1998) (*Gray*), and his right under art. 12 of the Massachusetts Declaration of Rights to "meet the witness [Parker] against him face to face."[13] He also moved to strike the phrase from the record. His objection and his motion both were denied. The jury were instructed that Parker's statement could be considered only against Parker, and not against the other defendants. Luis asserts error in the admission of Parker's statement and in the denial of his motion to strike the words "other members."

In *Bruton*, *supra* at 136, the United States Supreme Court held that, at a joint trial, admission in evidence of a nontestifying codefendant's confession that named the defendant as a participant in the crime violated the defendant's Sixth Amendment right of confrontation. The Court reasoned that, given the pretrial and human limitations on jurors' ability at a joint trial to disregard the "powerfully incriminating" statement of a codefendant that mentions the defendant by name, *id.* at 135, the presumption that jurors could follow a judge's limiting instruction failed to inspire confidence that such an instruction could cure any prejudice or avert the risk that jurors nevertheless

---

[13]Luis does not argue that art. 12 of the Massachusetts Declaration of Rights provides greater protection here than the Sixth Amendment to the United States Constitution, or that the analysis is different in their respective applications. We need not consider the question. See *Commonwealth* v. *James*, 424 Mass. 770, 781 & n.20 (1997); *Commonwealth* v. *Sinnott*, 399 Mass. 863, 874 n.9 (1987).

would consider the codefendant's statement against the defendant. *Id.* at 136-137.

In *Richardson* v. *Marsh*, 481 U.S. 200, 208-209 (1987) (*Richardson*), the Supreme Court considered whether *Bruton* required the same result at a joint trial where *all* references to a defendant in the nontestifying codefendant's confession have been redacted, but other properly admitted evidence linked the defendant to the confession. In that case three people, Martin, Williams, and Marsh, were involved in a double murder and an assault on a third victim. Martin was a fugitive at the time of trial. Williams and Marsh were tried together. Williams's confession, with all references to Marsh having been redacted, was admitted in evidence. *Id.* at 202-203. As redacted, Williams's confession indicated that only he and Martin had committed the crimes, and that they planned the killings while driving to the crime scene. Later in the trial, Marsh testified that she was in the back seat of the car as they drove to the crime scene, but had not heard their conversation. Contrary to the judge's warning and without objection from defense counsel, the prosecutor linked Marsh to the portion of Williams's confession describing his conversation with Martin in the car during his closing argument. *Id.* at 205. The confession thus provided evidence that Marsh knew about the crimes in advance and had knowingly participated in their commission. *Id.* at 203 n.1, 205.

In *Richardson*, *supra* at 207, the Court noted that *Bruton* established a "narrow exception" to the presumption that jurors follow instructions. In holding that *Bruton* did not apply, the Court said that a jury could be presumed to follow a limiting instruction to consider the confession of a nontestifying codefendant only against its maker where the confession made no reference at all to the defendant at their joint trial. The Court reasoned that unlike *Bruton*, *supra* at 124 n.1, 135, where the confession was deemed "powerfully incriminating" because it "expressly implicat[ed]" the defendant at the joint trial, the confession in *Richardson* "was not incriminating on its face, and became [incriminating] only when linked with evidence introduced later at trial." *Richardson*, *supra* at 208. The Court went on to say, "Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruc-

tion to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." *Id.* The Court added that it "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211 n.5.

The question left unanswered in *Richardson* was taken up in *Gray, supra.* The Court held that a redaction or substitution of a defendant's name that nevertheless leaves the confession "point-[ing] directly" or "refer[ring] directly" to the defendant falls within the reach of *Bruton. Gray, supra* at 193-196. *Gray,* like *Bruton,* involved only two perpetrators of a crime who were jointly tried. The only difference between the two cases was that the codefendant's confession that was admitted in evidence in *Bruton* was unredacted and named Bruton expressly. The codefendant's confession that was admitted orally in evidence in *Gray* contained the words "deleted" or "deletion" in place of Gray's name. *Id.* at 192. The Court acknowledged that the jury had to infer that Gray's name had been deleted, but it reasoned that "[t]he inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 196.

Turning to the case at hand, Parker's statement made no express reference to Luis, either as one who participated in the decision to kill the victim, or as one who threatened to kill Parker. See *Bruton, supra* at 135-136. Nor did it "obviously refer directly" to Luis. *Gray, supra* at 196. There were six participants in the killing, and Parker's use of the phrase "other members" does not necessarily encompass everyone else (including Luis), as for instance the phrase "*all* the other members" might connote. *Id.* The phrase "other members" signifies only *some* other members, without specifying who or how many. Unlike *Bruton* and *Gray,* where there were only two perpetrators and it was immediately apparent to the jury that the codefendant's confession, redacted or not, referred directly to the defendant (Bruton and Gray, respectively), Parker's statement cannot be understood to refer directly to Luis. Parker's statement alone

does not support an inference that Parker was referring to Luis. Other evidence was required to link Luis to the crime, and it did. See *Commonwealth* v. *Blake,* 428 Mass. 57, 60-61 (1998) (no *Bruton* violation where, at joint trial, statements of nontestifying codefendants did not expressly implicate any particular defendant); *Commonwealth* v. *Wilson,* 46 Mass. App. Ct. 292, 294-295, 298 (1999) (no *Bruton* violation where victim was stabbed by several men and nontestifying codefendant's statement declared, "We stabbed" victim).

Finally, because Parker's statement did not even indicate that Luis was present, it did not collide with Luis's alibi defense. Counsel for Parker did not even point to Luis in his closing argument. His focus, instead, was on Davenport, White, and Alleyne. We conclude there was no error in the admission of Parker's statement, where the jury could be presumed to follow the judge's limiting instruction that the statement could be considered only in the Commonwealth's case against Parker.

7. *Bloodstain pattern evidence.* All the other defendants joined in Parker's motion in limine to exclude blood spatter evidence, alleging it was not generally accepted as reliable within the relevant scientific community, nor had it been scientifically validated. See *Commonwealth* v. *Lanigan,* 419 Mass. 15 (1994). The motion was denied. Luis argues it was error not to conduct an evidentiary hearing on the motion.

The denial of the request for a hearing and the admission of expert testimony on the subject is reviewed for an abuse of discretion. *Commonwealth* v. *Pytou Heang,* 458 Mass. 827, 844 (2011). A hearing as to the scientific reliability of expert evidence is "generally not required where we have previously admitted expert testimony of the same type, where the testimony is offered for the same purpose, and where there is no factual issue as to whether the expert is qualified, whether the appropriate methodology has been followed, or whether the quality of the evidence is sufficient to permit an opinion." *Id.* at 845. Prior to the 2005 trial in this case expert testimony on the subject of blood spatter analysis had been accepted generally in the courts of the Commonwealth. See, e.g., *Commonwealth* v. *Fryar,* 425 Mass. 237, 251, cert. denied, 522 U.S. 1033 (1997); *Commonwealth* v. *Simmons,* 419 Mass. 426, 433 (1995). The

Commonwealth was not proceeding on any new theory of blood spatter analysis at the trial of this case, and the expert testimony otherwise satisfied the test in the *Pytou Heang* case. This was sufficient basis to deny the motion.

In addition, neither Parker nor Luis offered anything by way of affidavit or otherwise to suggest that such testimony should no longer be routinely admitted. See M.S. Brodin & M. Avery, Massachusetts Evidence § 7.5.1, at 419 (8th ed. 2007 & Supp. 2012). See also *Commonwealth* v. *Pytou Heang, supra*; *Commonwealth* v. *Patterson*, 445 Mass. 626, 640-644 (2005). Since the trial in this case we have recognized expert bloodstain pattern analysis evidence as scientifically reliable, conformably with the *Lanigan* standard. See *Commonwealth* v. *Powell*, 450 Mass. 229, 237-240 (2007). We conclude that the judge did not abuse his discretion in denying the motion for a *Lanigan* hearing.

Luis next contends that the view of the relevant scientific community as to the reliability of bloodstain pattern analysis has changed so as to call into question whether, since *Commonwealth* v. *Powell, supra*, it continues to enjoy general acceptance in that community. Luis relies on a National Academy of Science report, National Research Council, Strengthening Forensic Science in The United States: A Path Forward (2009) (report). In particular, he cites that portion of the report that states "[i]n general, the opinions of bloodstain pattern analysts are more subjective than scientific. In addition, many bloodstain pattern analysis cases are prosecution driven or defense driven, with targeted requests that can lead to context bias." *Id.* at 178. The report was published in 2009, approximately four years after the trial in this case. The report is not part of the record in the case. It was not presented to the judge at trial, or in a motion for a new trial. It is not properly before us. See *Commonwealth* v. *Iglesias*, 426 Mass. 574, 579 n.4 (1998).

In any event, and contrary to Luis's contention, the report does not conclude that blood spatter analysis is unreliable. The report notes that "[u]nderstanding how a particular bloodstain pattern occurred can be critical physical evidence, because it may help investigators understand the events of the crime." Report, *supra* at 177. The report cautions that "many sources of variability arise with the production of bloodstain patterns, and

their interpretation is not nearly as straightforward as the process implies . . . . Bloodstain patterns found at scenes can be complex, because although overlapping patterns may appear simple, in many cases their interpretations are difficult or impossible." *Id.* at 177-178. The report says nothing to indicate such evidence is unreliable or should be deemed inadmissible as a matter of law. The fact that such opinion evidence may be more subjective than scientific merely goes to the weight of the evidence, not its admissibility. The jury heard testimony as to the limitations of blood spatter analysis, including testimony that it is a subjective discipline. Even if the report had been available and presented to the court at the time of trial, the judge would not have abused his discretion in admitting the blood spatter evidence. See *Commonwealth* v. *Gambora*, 457 Mass. 715, 723-729 (2010).

8. *Sufficiency of the evidence.* Luis asserts error in the denial of his motion for a required finding of not guilty of aggravated rape at the close of the Commonwealth's case, and again at the close of all the evidence. The issue Luis presses on appeal is the sufficiency of the evidence of lack of consent. He contends there was no evidence of sexual trauma, and there was no evidence the victim resisted in any way. Further, he argues, there was no evidence of constructive force. Rather, the evidence was to the contrary: Davenport testified the victim was not upset during the immediate aftermath of the intercourse, and she seemed happy. White testified the victim said she loved Luis and could not believe she had ever been with Bamford, her former boy friend.

In a rape case, the element of force and against the will of the victim may be established by physical force or constructive force. See *Commonwealth* v. *Caracciola*, 409 Mass. 648, 652 (1991); *Commonwealth* v. *Newcomb*, 80 Mass. App. Ct. 519, 521 (2011). Constructive force requires "proof that the victim was afraid or that she submitted to the defendant because his conduct intimidated her." *Id.* The jury could have found beyond a reasonable doubt that, based on the evidence, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), the victim had sex with Luis because she was fearful of what would happen if she did not submit to him.

The victim had been made aware of the gang's rules, provision for punishment that included death, and that punishment would be meted out against an offending member's family if the offender could not be located. She was present when Luis told the group he had killed someone. She also was present when Luis, Ismael, and Parker were angered by information (provided by Alleyne) that Bamford, to whom she was "married" during a gang ceremony, had betrayed the gang. They directed their anger at her after learning about her dream about blood dripping from a tree, and her interpretation that it meant she had advance knowledge of Bamford's betrayal. White and Alleyne persisted in their accusations against the victim as the group was driving back from Lawrence. When the victim tried to get out of the car at a traffic light Ismael prevented her from doing so and told the others not to let her go. Thereafter, the victim readily offered to kill Bamford to prove herself. There was sufficient evidence from which the jury could have inferred that the victim did not consent to have sex with Luis, and submitted because she was fearful of him, Ismael, and Parker. The evidence on which Luis relies easily could have been interpreted by the jury as supporting a finding that the victim was indeed fearful and was merely trying to curry favor with the person she perceived to be a leader of the gang. There was no error in the denial of the motions for a required finding of not guilty.

9. *G. L. c. 278, § 33E.* We have reviewed the briefs and the entire record, and discern no reason to reduce the degree of guilt on the murder convictions or order a new trial for any of the defendants.

*Judgments affirmed.*